**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen, Esq. (LR 5733)
Phillip Kim, Esq. (PK 9384)
Jonathan Horne, Esq. (JH 7258)
275 Madison Avenue, 34th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email:  lrosen@rosenlegal.com

*Lead Counsel for Plaintiffs and the Putative Class*



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STREAM SICAV, DHARANENDRA RAI, AND TIEN CHUNG, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,<br><br>    Plaintiff,<br><br>v.<br><br>JAMES JUN WANG, SMARTHEAT, INC., WEIGUO WANG, XIN LI, QINGTAI KONG, OLIVER BIALOWONS, AND MICHAEL WILHELM,<br><br>    Defendants. | Case No: 12-cv-6682-PAE<br><br><u>ECF CASE</u><br><br><u>CLASS ACTION</u><br><br>**JURY TRIAL DEMANDED** |

**FIRST AMENDED COMPLAINT FOR VIOLATIONS
<u>OF THE FEDERAL SECURITIES LAWS</u>**

Lead Plaintiff Stream SICAV and named plaintiffs Dharanendra Rai and Tien Chung, by their undersigned attorneys, for their complaint against Defendants James Jun Wang, SmartHeat Inc. ("SmartHeat" or the "Company", or occasionally "SmartHeat, Inc.", for clarity), Weiguo Wang, Xin Li, Qingta Kong, Oliver Bialowons, and Michael Wilhelm, allege the following based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters.

## I.  <u>NATURE OF THE ACTION</u>

1.      This is a federal securities class action on behalf of a class consisting of all persons and entities, other than Defendants and their affiliates, or entities associated with Benjamin Wey or Robert Newman, who purchased the publicly traded common stock of SmartHeat from February 24, 2010 to May 30, 2012.

2.      SmartHeat is a holding company whose operations take place primarily in China. During the Class Period, its stock traded on the NASDAQ.

3.      Between February 24 and August 13, 2010, SmartHeat's CEO, founder, and the Chair of its Board, James Jun Wang, secretly sold at least half of his SmartHeat shares for $23 million. These shares were subject to a lock-up agreement, which prevented their sale until January 2012.

4.      Wang's sales were arranged by Robert Newman of Newman & Morrison, LLP. Newman was *SmartHeat*'s counsel and was the escrow agent holding Wang's locked-up shares at the time of the stock sales. Despite his flagrant breach of contract, malpractice, and breach of his fiduciary duty to SmartHeat, he is still SmartHeat's counsel today.

5.      Wang paid over $1 million in "commissions" to have First Merger Capital, Inc. sell his stock. $1.1 million in commissions is far above commercially reasonable rates for mere stock sales. But as Wang knew, First Merger was obligated to report Wang's sales. Wang's $1.1 million did not buy First Merger's services in selling stock; it bought its silence.

6.      The securities laws and SEC regulations require that officers of public companies disclose any transactions they make in their company's securities. Wang broke those laws, and committed securities fraud.

7.      SEC regulations require issuers accurately to disclose share ownership of officers and directors in various filings. SmartHeat continued to file SEC reports that falsely represented Wang's shareholdings, and committed securities fraud.

8.      The federal securities laws require that officers certify that they are responsible for maintaining adequate controls over financial reporting and that they have disclosed any fraud that they know of to their auditors. Wang certified that he maintained adequate controls over financial reporting. Wang further certified that he had disclosed "any fraud" to SmartHeat's auditors. These statements were false because the internal controls whose adequacy Wang certified did not prevent him from engaging in the fraudulent stock sales. And Wang had not disclosed "any fraud" to SmartHeat's auditors or they would have demanded that he report his fraudulently non-disclosed stock sales. Yet Wang falsely made the certification anyway, and committed securities fraud.

9.      Wang's sale of half his holdings -- almost 19% of SmartHeat's float, representing 5% of total sales of SmartHeat stock each trading day between February 24 and August 13, 2010 -- caused SmartHeat's stock price to fall by more than 40% over the course of the sales, damaging investors.

10.     When SmartHeat's board of directors learned that Wang had sold half his stake in SmartHeat without disclosing the sale, the board held an extraordinary two day meeting that concluded on May 25, 2012. At the conclusion, Wang resigned from his position at SmartHeat, Inc. -- i.e., the holding company. Wang, however, maintained all his other positions with SmartHeat's subsidiaries.

11.     Conveniently, this meant that SmartHeat would no longer be required to report Wang's shareholdings, while keeping Wang on the payroll.

2

12.     SmartHeat also obtained a $2,000,000 revolving line of credit from Northtech Holdings, Inc. The revolving line of credit accrued interest of 1.25% a month, included a 4% origination fee, and was secured by most of SmartHeat's assets. Wang is one of Northtech's principals.

13.     SmartHeat announced the May 25 meeting on May 30. That same day, NASDAQ, halted trading in SmartHeat's shares. NASDAQ demanded more information regarding "the restructuring of [SmartHeat's] board and management and [SmartHeat's] entry into a secured revolving credit facility."[1]

14.     While SmartHeat's stock was still halted, NASDAQ informed SmartHeat that it would remove SmartHeat's stock from listing. NASDAQ determined to "apply more stringent criteria" under Listing Rule 5101. Listing Rule 5101 is used "to maintain the quality of and public confidence in [NASDAQ], to prevent fraudulent and manipulative acts and practices, to promote just and equitable principles of trade, and to protect investors and the public interest."

15.     As this Amended Complaint is filed, SmartHeat has yet to restate its financial statements to correct its CEO's shareholdings.

16.     When trading resumed on the pink sheets, SmartHeat's per-share stock price fell from $4.04 to $1.30 on the first trading day, further damaging investors.

## II.  JURISDICTION AND VENUE

17.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. § 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

18.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

19.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b) as a substantial part of the conduct complained of herein occurred in this District.

---

[1] Source: SmartHeat, Inc. Press Release dated November 9, 2012.

20.     In connection with the acts, conduct and other wrongs alleged herein, Defendants either directly or indirectly used the means and instrumentalities of interstate commerce, including but not limited to the United States mails, interstate telephone communications and the facilities of the national securities exchange.

### III.   PARTIES AND IMPORTANT THIRD PARTIES

### A.     PLAINTIFFS.

21.     Plaintiff **Stream SICAV** purchased SmartHeat securities and has been damaged thereby. Its PSLRA certification was previously filed with the Court and is incorporated by reference.

22.     Named Plaintiff **Dharanendra Rai** purchased SmartHeat shares and has been damaged thereby. His PSLRA certification is attached in Exhibit 1 to this complaint and is incorporated by reference.

23.     Named Plaintiff **Tien Chung** purchased SmartHeat shares and has been damaged thereby. His PSLRA certification is attached in Exhibit 1 to this complaint and is incorporated by reference.

24.     Stream SICAV, Rai, and Chung are the "Plaintiffs"

### B.     PRE-MAY 25, 2012 DEFENDANTS.

25.     Defendant **James Jun Wang** is SmartHeat's founder. During the Class Period, Wang was SmartHeat's CEO and the Chair of its Board. Wang resigned from his role as SmartHeat's CEO after an extraordinary Board meeting on May 24-25, 2012, although he is still listed as Founder, Chairman & CEO on SmartHeat's website. Defendant Wang, however, retained his positions with SmartHeat's subsidiaries. These positions include his role as Chairman and Chief Executive Officer of SmartHeat Taiyu (Shenyang) Energy Technology Co., Ltd. ("Taiyu"), SmartHeat's principal subsidiary.

26.     Wang founded Taiyu in 2002.

27.     Defendant **SmartHeat, Inc.**, is a Nevada holding company whose main operations are located in China. It designs, manufactures and sells clean technology plate heat

4

exchangers and related systems in China. SmartHeat plate heat exchangers and systems are used by commercial and residential buildings.

### C.    COVER-UP DEFENDANTS.

28.    Defendant **Weiguo Wang** ("W. Wang") has been, since his appointment on June 19, 2008, a SmartHeat director.  As of at least February 4, 2009 until today, W. Wang also serves on SmartHeat's Audit Committee, Compensation Committee, and Nominating and Corporate Governance Committees.

29.    Defendant **Xin Li** was appointed as Director, and member of the Audit, Compensation, and Nominating and Corporate Governance Committees on July 29, 2009, and remains in these positions today.

30.    Defendant **Qingtai Kong** was elected as director of SmartHeat on September 23, 2011, and was then appointed to the Audit, Compensation, and Nominating and Corporate Governance Committees. He remains in these positions today.

31.    On May 25, 2012, Defendant **Oliver Bialowons** was appointed Director and President of SmartHeat "to fill the roles formerly held by [...] Wang" at SmartHeat, Inc.[2]

32.    On July 11, 2012, Defendant **Michael Wilhelm** was appointed as CFO of SmartHeat. He remains in this position today.

33.    Collectively, Defendants W. Wang, Li, Kong, Bialowons, and Wilhelm are the "Cover-Up Defendants".

34.    Collectively, the Cover-Up Defendants and Wang are the "Individual Defendants".

### D.    WITNESSES AND THIRD PARTIES.

35.    **First Merger Capital, Inc.** was the firm employed by Wang to sell his shares.

36.    First Merger no longer exists. Various principals and employees, including Maureen Gearty, James Altschul, William Scholander, Talman Harris, and Mark Simonetti were all subject to disciplinary action for (among one other act) aiding Wang in selling his stock.

---

[2] Source: Press Release issued by SmartHeat, Inc., on May 30, 2012.

37.    First Merger was established with a $350,000 payment from the notorious Benjamin Wey, SmartHeat's promoter, for certain unspecified services.

38.    **Maureen H. Gearty** was a broker-dealer employed by First Merger between its founding on November 2009 and May 2011. Ms. Gearty was familiar with the operations of First Merger.

39.    Ms. Gearty testifies that Wang directed the sales of 380,000 shares of stock

40.    **James Sloan Altschul** was Chief Compliance Officer of First Merger.

41.    Altschul signed off on Wang's sales.

42.    **Benjamin Wey** is a notorious promoter of fraudulent Chinese companies. Two companies -- Bodisen Biotech, Inc., and CleanTech Innovations, Inc. -- were delisted because they failed to disclose their relationship to Wey and payments they made to Wey. Wey has recently had his home and offices raided by the FBI for his role in promoting fraudulent small-cap Chinese companies.

43.    Wey was SmartHeat's promoter. Wey also introduced Wang to First Merger and Robert Newman, and had direction over the accounts Wang used to sell SmartHeat shares.

44.    **Robert Newman** was -- and *is* -- SmartHeat's counsel. Newman was also the escrow agent designated in the agreement that locked up all of Wang's shares.

45.    Newman allowed Wang to withdraw his shares placed in escrow, and directed First Merger in setting up accounts to allow their sale.

## IV.  <u>DEFENDANTS' MISCONDUCT</u>

46.    SmartHeat became a U.S. publicly-traded company by a reverse merger. In a reverse-merger, a dormant U.S. publicly-traded shell with no or few operations acquires a privately held company. In exchange, the privately-held company acquires substantially all of the shares of the publicly-traded company. Thus, while in form a reverse-merger is an acquisition of a private company by a public company, in economic substance it is the acquisition of a public company by a private company.

6

47.     In SmartHeat's corporate history, the shell was Pacific Goldrim Resources, Inc., and the private company it "acquired" was Shenyang Taiyu Machinery & Electronics Equipment Co., Ltd. ("Taiyu"). SmartHeat reverse-merged into Taiyu on April 14, 2008.

48.     Wang was SmartHeat's CEO and the Chair of its Board for the entire Class Period.

49.      Wang founded Taiyu, the company that would become SmartHeat.

50.     SmartHeat regularly touted Wang's experience and expertise as a reason for investors to invest in SmartHeat. For example, SmartHeat touted his education at "China's 'MIT'", his tenure as the manager of sales at Honeywell China. SmartHeat similarly touted Wang's vision in founding Taiyu, and leadership in sustaining it.

51.     Wang owns half of all equitable and legal rights, title, and interests in and to Beijing YKSN Machinery & Electronic Equipment Co., Ltd. ("YSKN"). Wang has the power to dispose of YSKN's SmartHeat shares, along with YSKN's other half-owner.

52.     At the beginning of the Class Period, YSKN owned 680,800[3] SmartHeat shares.

53.     Wang claims that under SEC rules, he is beneficial owner of half of YSKN's SmartHeat shares, or 340,400 shares.

54.     At the beginning of the Class Period, this interest amounted to half of YSKN's 20.76% interest in SmartHeat, or 10.38%.

55.     SmartHeat touted Defendant Wang's over-10% ownership of it. As a result of his 10% ownership of SmartHeat, Defendant Wang was purportedly SmartHeat's second largest shareholder.

56.     In a January 29, 2009 press release, SmartHeat announced that Wang and other officers had entered into lock-up agreements preventing their sale of any shares of the company's stock until January 2012. SmartHeat quoted Wang as saying:

> As SmartHeat's founders and managers, we are very comfortable with our strategic position and earnings growth in 2009 and beyond. Our NASDAQ listing is a result of SmartHeat's continued efforts and commitment towards good corporate governance. Our entire senior management team has voluntarily entered

---

[3] Adjusted for a 10-1 reverse stock split which took place on February 7, 2012.

into share lock-ups as a reflection of our great confidence in the prospect of SmartHeat. As a public company, we look forward to years of sales and earnings growth supported by our dedicated employees and growing list of shareholders

57.    SmartHeat represented that all the shares, including all of Wang's shares, would be held in escrow with its counsel Robert Newman of Newman & Morrison, LLP

58.    In a July 7, 2009 press release, SmartHeat reiterated that its management had signed a lockup agreement. SmartHeat's press release quoted Wang as saying:

As SmartHeat's largest shareholders, our management team has voluntarily locked up their entire shareholdings for 3 years until January 2012. Our vested interest is with our shareholders. SmartHeat is highly sensitive to shareholder dilution in any financing activities. Today's completion of the $9 million credit financing not only causes no dilution to our shareholders but also provides sufficient cash flow as we enter our busiest and the strongest quarter in a year. This financing allows SmartHeat to continue its current growth momentum of winning significant customer orders in a favorable market environment.

59.    Shareholders reasonably believed that neither Wang nor any insider would sell his shares until January 2012.

60.    When Wang actually sold his shares, he had an obligation to correct his previous statements.

### A.    BOTH SMARTHEAT AND WANG MUST DISCLOSE ANY SALE OF SMARTHEAT STOCK WANG MAKES.

61.    SmartHeat was required accurately to disclose YSKN and Defendant Wang's share ownership in every 10-K and any registration statement it filed with the SEC, as well as any annual statement it issued securities holders. *See* 17 C.F.R. § 229.10. SmartHeat and Wang were aware of this requirement, as they included information purporting to set out Wang's shareholdings in every 10-K, every registration statement, and every annual statement issued to securities holders.

62.    Wang was required to file a Form 4 within 2 business days of each SmartHeart stock sale either he or YSKN made. 15 U.S.C. § 78p; 17 C.F.R. 240.16a-3. Wang was aware of this requirement as he filed Forms 4 on June 30, 2008 (required by the acquisition of SmartHeat stock by YSKN) and November 29, 2011 (required by Wang's own personal acquisition of stock through an equity incentive plan).

63.     As an owner of more than 5% of SmartHeat's stock, YSKN was required to disclose its ownership in a Schedule 13D. 15 U.S.C. § 78m(d). It did so in a Schedule 13D filed on April 25, 2008. YSKN was required to file an amendment to its Schedule 13D whenever a material change occurs in its shareholding. 15 U.S.C. § 78m(d)(2). YSKN was aware of this requirement, as it filed an amendment to its Schedule 13D on June 30, 2008.

64.     The Sarbanes-Oxley Act of 2002 (the "SOX") requires the CEO to make certain certifications  accompanying each periodic or annual report (i.e., 10-Qs and 10-Ks). The SOX certifications provide, in relevant part:

> (2)     Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> (3)     The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:  [. . .]
>
> *   *   *
>
> (b)     Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
>
> *   *   *
>
> (5)     The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions): [. . .]
>
> *   *   *

> (b)      Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

**B.     WANG SECRETLY SOLD $23 MILLION OF SMARTHEAT STOCK WITHOUT MAKING REQUIRED DISCLOSURES AND TAKING PAINS TO CONCEAL HIS ACTS.**

65.     Between February 24 and August 13, 2010, Wang secretly sold more than half of YSKN's SmartHeat shares -- 380,000 shares-- for $23 million. He did so through SmartHeat's counsel, Robert Newman of Newman & Morrison. Newman' s participation was necessary. He was the shares' custodian, as they had been placed in escrow with him.

66.     To arrange for the sale, Wang recruited four current and former SmartHeat employees. Through SmartHeat's counsel, Wang arranged to have these customers establish accounts with First Merger in February 2010. Three customers had annual incomes between $25,000 and $50,000, and the fourth had an income between $50,000 and $100,000. All four had net worth of $50,000 to $100,000, and a liquid net worth of $25,000 to $50,000.

67.     First Merger never communicated directly with any of the four customers.

68.     Wang obtained power-of-attorney over the four accounts on February 5, 2010. That same day, Wang entered an "Amended and Restated Lock-Up Agreement" (the "Amended Agreement").[4]

69.     The four customers deposited 380,000 shares of SmartHeat stock in their accounts, all on February 18, 2010.

70.     Beginning on February 24, 2010, Wang, through Newman, ordered First Merger to begin selling the stock in the four accounts. He ordered First Merger to sell stock amounting to

---

[4] The Amended Agreement dated February 5, 2010, locked-up Wang's stock sales until "January 1, 2010." Either the reference to January 1, *2010* rather than 2012 was a scrivener's error, or Wang should have corrected his earlier statements claiming that his shares were locked-up till January 1, 2012. Neither the Amended Agreement's terms nor its existence have ever been disclosed by SmartHeat.

5% of SmartHeat's total volume each day. First Merger provided Wang with weekly emails updating him on the sales of his stock.

71.     Wang completed selling in the accounts by August 13, 2010. The SmartHeat stock sales generated over $23 million in proceeds.

72.     The SmartHeat stock sales were the only transactions in the four accounts.

73.     FINRA (the Financial Industry Regulatory Authority) members must file a Suspicious Activity Report when they have reasonable grounds to suspect a company insider is selling stock. 31 C.F.R. § 103.19. A Suspicious Activity Report alerts the authorities that (among other things), an insider may be violating the securities laws. As FINRA would later charge and First Merger personnel acknowledge, the circumstances of the stock sales gave First Merger reasonable grounds to suspect that Wang was selling his SmartHeat stock.

74.     However, Wang paid $1.1 million in "commissions" to First Merger for selling the stock. Because Wang paid First Merger these "commissions", First Merger did not report the sales.

75.     $1.1 million merely to sell stock, and merely to sell $23 million of stock, is a commercially unreasonable commission. Hence, Wang's purpose in providing this "commission" was not to sell the stock but to ensure that First Merger did not report the stock sales. The $1.1 million was a bribe.

76.     Because he sold half his shareholdings, Defendant Wang should have caused the following filings to be made:

       a.   A Form 4, on behalf of himself, announcing a sale of at least190,000 of his shares; and

       b.   An Amendment to YSKN's Schedule 13D, announcing that it had sold 380,000 shares.

77.     SmartHeat was required to accurately disclose its CEO's shareholdings in any proxy statement, registration statement, or 10-K. SmartHeat falsely stated that its CEO still held 340,400 shares in all of these filings. But SmartHeat continued to insist that Wang still owned

340,400 shares. Hence SmartHeat falsely touted Wang's shareholdings in the following SEC filings:

    a.  SmartHeat's 2010 10-K, filed with the SEC on March 15, 2011;

    b.  SmartHeat's 2011 10-K, filed with the SEC on April 2, 2012;

    c.  SmartHeat's Registration Statement on Form S-3, filed with the SEC on October 15, 2010;

    d.  SmartHeat's proxy statement to security holders for the May 25, 2010 annual meeting, filed with the SEC on April 16, 2010;

    e.  SmartHeat's proxy statement to security holders for the annual meeting to be held on September 23, 2011, filed with the SEC on August 8, 2011.

78.    Wang signed certifications accompanying every 10-Q and every 10-K in the class period, including:

    a.  SmartHeat's 2010 10-K, filed with the SEC on March 15, 2011;

    b.  SmartHeat's 2011 10-K, filed with the SEC on April 2, 2012;

    c.  A quarterly report on Form 10-Q, filed with the SEC on May 11, 2010;

    d.  A quarterly report on Form 10-Q, filed with the SEC on August 12, 2010;

    e.  A quarterly report on Form 10-Q, filed with the SEC on November 10, 2010;

    f.  A quarterly report on Form 10-Q, filed with the SEC on May 10, 2011;

    g.  A quarterly report on Form 10-Q, filed with the SEC on August 9, 2011;

    h.  A quarterly report on Form 10-Q, filed with the SEC on November 8, 2011;

    i.  A quarterly report on Form 10-Q, filed with the SEC on May 15, 2012;

    j.  Various amended annual and quarterly reports filed on April 13, 2012.

79.    Each of these forms made false statements:

    a.  They falsely certified that Wang had designed adequate systems of internal control over financial reporting. In reality, SmartHeat's internal controls failed to document that Wang had sold half or more of his shares without making the required disclosures and in violation of his lock-up agreement. Wang knew

this because he had arranged the sales through Robert Newman, SmartHeat's outside counsel.

b.  They falsely certified that Wang had told to his auditors of "any fraud [...] whether or not material." In reality, Wang had not told his auditors that he had not disclosed his stock sales to investors by filing the Forms 4 and amendments to Schedule 13D, and had not disclosed to investors that he had breached his lock-up agreement with the Company. If he *had* told them, they would have told him to file the Forms 4 and Schedule 13D. If they told him to file the Forms 4 and Schedule 13D, and he didn't, they would have resigned. This conduct is securities fraud. Hence, the statement that he had disclosed "any fraud [...] whether or not material" was false.

80.    In addition, the certifications accompanying each 10-K falsely certified that the 10-K contained no false statements, to the best of Wang's knowledge. But actually, each 10-K falsely stated that Wang still held 340,400 shares or more, even though he had actually sold half or more of these shares.

### C.    DEFENDANTS' KNOWLEDGE AND *SCIENTER* MAY BE IMPUTED TO SMARTHEAT UNDER *RESPONDEAT SUPERIOR* AND BECAUSE SMARTHEAT GRANTED DEFENDANTS APPARENT AUTHORITY.

81.    SmartHeat is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency as all of the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

82.    The *scienter* of the Individual Defendants and other employees and agents of the Company is similarly imputed to SmartHeat under *respondeat superior* and agency principles.

83.    SmartHeat's and Wang's interests in not disclosing Wang's sales were aligned. Throughout the Class Period, SmartHeat sought outside investments to bolster its financial

condition. On November 23, 2010, only months after Wang sold his stock without disclosing his sales, SmartHeat itself sold $28,704,070 shares, with proceeds to SmartHeat of $27,268,866.50. SmartHeat's income from operations for 2010 was $22,618,630, meaning that SmartHeat made more money in 2010 from selling its stock than it made from selling its products.

84.     In addition, as officers and directors or SmartHeat, the Individual Defendants had apparent authority to speak on SmartHeat's behalf. As its Chairman, founder, and CEO, Wang had apparent authority to act on SmartHeat's behalf. From the perspective of third parties, it appeared that SmartHeat had entrusted Wang to speak on its behalf regarding (a) his own shareholdings in SmartHeat stock; (b) YSKN's shareholdings in SmartHeat stock; (c) whether SmartHeat's financial statements contained untrue statements of material fact; (d) whether Wang had designed adequate systems of internal control; and (e) whether Wang had disclosed any fraud to SmartHeat's auditors (and the related statement Wang made to SmartHeat's auditors that Wang was not aware of any fraud at SmartHeat).

85.     Plaintiffs and the Class relied on the accuracy of statements Wang and SmartHeat made in SmartHeat's SEC filings.

86.     SmartHeat is liable for statements Wang made when Wang had apparent authority to make them.

## D.     COVER-UP DEFENDANTS DISCOVER WANG'S FRAUD, TRANSFER HIM TO A POSITION WHERE HE IS NOT REQUIRED TO DISCLOSE HIS SHAREHOLDINGS, AND MAKE FURTHER FALSE AND MISLEADING STATEMENTS.

87.     In 2011, the Financial Industry Regulatory Authority ("FINRA") began an investigation of First Merger personnel.

14

88.     The investigation concluded on or before December 21, 2011. The FINRA investigation issued findings that are, in substance, identical to the allegations in ¶¶47-55 of this Complaint. As a result, FINRA charged James Sloan Altschul, a broker-dealer associated with First Merger who was also First Merger's Chief Compliance Officer and Anti Money Laundering Compliance Officer, with securities laws violations for his "failure to supervise customer liquidations of [SmartHeat]".

89.     Pursuant to FINRA Rule 9216, Altschul signed a FINRA Letter of Acceptance, Waiver and Consent, conceding the findings that are, in substance, identical to the allegations in ¶¶65-75 of this Complaint.[5] The Letter of Acceptance, Waiver, and Consent was accepted by FINRA on January 31, 2012. On January 31, 2012, FINRA also filed a complaint against William Scholander, Talman Harris, Ronen Zakai, and Maureen Gearty -- all of First Merger -- alleging facts that are, in substance, identical to the allegations in ¶¶65-75 of this Complaint.

90.     Plaintiffs' investigator spoke with Ms. Gearty, who confirmed that FINRA's findings are true.

91.     Ms. Gearty declares that:

    a.  First Merger sold large quantities of SmartHeat stock in 2010;

    b.  The relationship between SmartHeat and First Merger began when Wang went to Newman to set up accounts for Deer and SmartHeat under the direction of Benjamin Wey;

---

[5] FINRA Rule 9216 provides in relevant part:"If the Department of Enforcement or the Department of Market Regulation has reason to believe a violation has occurred *and the member or associated person does not dispute the violation*, the Department of Enforcement or the Department of Market Regulation may prepare and request that the member or associated person execute a letter *accepting a finding of violation*, consenting to the imposition of sanctions, and agreeing to waive such member's or associated person's right to a hearing before a Hearing Panel or, if applicable, an Extended Hearing Panel, and any right of appeal to the National Adjudicatory Council, the SEC, and the courts, or to otherwise challenge the validity of the letter, if the letter is accepted." FINRA Rule 9216(a) (emphasis added). Thus, unlike a settlement in which a party need not admit liability, a Letter of Acceptance, Waiver, and Consent is a finding of liability.

    c.   Wang had previously done business with two brokers at First Merger, Keith Talman Harris and William Scholander. Harris and Scholander had also previously worked for at Wey's firm;[6]

    d.   Newman set up the trading and wire accounts for Wang at First Merger. In fact, Newman "set up everything";

    e.   Wang had power-of-attorney over the SmartHeat "employees accounts" at First Merger and directed the sales of SmartHeat stock;

    f.   First Merger only every dealt with Wang at SmartHeat, never with the four customers or any other employee or director of SmartHeat;

    g.   Altschul approved the sales of SmartHeat stock; and

    h.   Wey's firm, the New York Global Group, is in essence a criminal enterprise encompassing SmartHeat and many other companies. Newman is a lieutenant of the enterprise.[7]

92.    Learning of Wang and SmartHeat's false statements, SmartHeat's Board of Directors called an extraordinary meeting.

93.    The extraordinary meeting began on May 24, 2012. It lasted for two days. It was attended by Defendants W. Wang, Li, and Kong.

94.    On May 25, at the conclusion of the meeting, Wang tendered his resignation from the positions he held with SmartHeat, Inc., the U.S. shell company. However, according to SmartHeat, he maintained all other positions he held with SmartHeat's subsidiaries.

95.    If Wang were still employed at SmartHeat, Inc., SmartHeat would be required to disclose his shareholdings in every proxy statement or 10-K. In turn, such disclosure would alert investors to the fact that Wang had covertly and unlawfully sold at least half his SmartHeat shareholdings.

---

[6] Scholander and Harris had been employees of New York Global Securities, an arm of the New York Global Group, Wey's firm.

[7] According to FINRA, Newman was also  involved in roadshows made by Deer Consumer Products, Inc. another Wey client. Wey gave $350,000 to First Merger to have them promote Deer's stock to their clients without disclosing their conflict of interest.

96.     In contrast, by terminating Wang from his positions at SmartHeat, Inc., SmartHeat's officers and directors believed they could turn a blind eye to Wang's stock sales. SmartHeat believes it can continue to rely on the disclosures made by Wang and YSKN, even though SmartHeat and the Cover-Up Defendants know that these disclosures are false.

97.     Hence the purpose of dismissing Wang from his positions at SmartHeat, Inc., without terminating him from his positions at SmartHeat's subsidiaries was to avoid having to make continuing disclosures regarding Wang's SmartHeat shareholdings.

98.     At the conclusion of the May 25 meeting, Bialowons was appointed as SmartHeat's CEO. On July 11, 2012, Wilhelm was appointed SmartHeat's CFO.

99.     After the May 25 meeting, SmartHeat continued to make false statements regarding Wang and YSKN's SmartHeat shareholdings, falsely claiming that YSKN owned 680,800 shares, and that Wang was therefore the beneficial owner of 340,400 shares (half of YSKN's shares). SmartHeat made these false statements in a Preliminary Proxy Statement filed with the SEC on October 15, 2012, and in a Definitive Proxy Statement filed with the SEC on October 26, 2012 (collectively the "Proxy Statements"). As support for this statement, SmartHeat states: "Disclosed on Amendment No. 1 to the Schedule 13D [YSKN] filed on June 30, 2008, for beneficial ownership as of May 7, 2008."

100.    Nor did SmartHeat correct its earlier statements regarding Wang's lock-up agreement to alert investors to the fact that Wang had breached the lock-up agreement.

101.    Bialowons and Wilhelm participated in drafting the Proxy Statements and controlled their contents. They had ultimate authority over the Proxy Statements.

102.    Under Nevada law, officers and directors may not rely on information provided to them by employees of the corporation "if the director or officer has knowledge concerning the matter in question that would cause reliance thereon to be unwarranted." N.R.S. 78.138.

103.    Bialowons and Wilhelm's knowledge that Wang's disclosures were inaccurate made their reliance on them unwarranted.

**E.    SMARTHEAT OBTAINS A $2,000,000 REVOLVING LOAN ON ONEROUS TERMS FROM AN ENTITY OWNED BY WANG.**

104.    On May 25, 2012, SmartHeat approved borrowing up to $2,000,000 pursuant to a revolving line of credit provided by Northtech Holdings, Inc.

105.    Northtech is owned by current and former SmartHeat officers, including Wang, Xudong Wang (formerly Vice President of Strategy and Development), and Wen Sha (formerly Vice President of Marketing), and Huajun Ai, SmartHeat's Corporate Secretary.

106.    The material terms of the revolving line of credit are:

    a.  It allows SmartHeat to borrow up to $2,000,000;

    b.  It imposes an interest rate of 1.25% per month, compounded monthly, plus an $80,000 origination fee, payable at closing (i.e., the annualized interest rate is 18% +4% origination fee on a 9-month credit facility (annualized interest 5.125%), or 23.125%);

    c.  It is secured by a lien on all of SmartHeat's U.S. accounts and intangibles located in the U.S., all SmartHeat's trademarks in China, and 35% of SmartHeat's ownership of its subsidiaries;

    d.  Its term is 9 months.

**F.    ADDITIONAL FACTS PROBATIVE OF SCIENTER.**

107.    First Merger was created after the notorious Benjamin Wey, a promoter of fraudulent U.S.-listed China-based companies, made a payment of $350,000 on December 17, 2009 to individuals to set it up. The individuals contractually obligated themselves to provide Wey certain unspecified future services. First Merger rented offices in the same building as Wey's offices -- 40 Wall Street.

108.    The NYSE Amex and the NASDAQ have each delisted a company's stock for concealing that they had hired Wey as their promoter, and concealing payments the companies made to Wey. The NYSE Amex delisted Bodisen Biotech, Inc., and the NASDAQ delisted CleanTech Innovations, Inc.

109.    Benjamin Wey was SmartHeat's promoter.

110.    Benjamin Wey directs the companies he promotes like SmartHeat to employ Robert Newman as outside counsel. Benjamin Wey also directs the companies he promotes to employ Ahmed Mohidin, partner at Goldman Kurland & Mohidin, LLP ("GKM"), as their auditor. GKM has no offices in China for the many Chinese companies it audits. Rather, it employs a small China-based audit firm to conduct all of its audit work. In all of Beijing, that audit firm chooses to rent office space next to Wey's firm. Wey's firm has offices that open into the audit firm's offices, and the two firms share a server.

111.    SmartHeat retained Robert Newman as its counsel and Ahmed Mohidin as its auditor.

112.    Like many of Wey's companies, SmartHeat raised large amounts of capital by selling its shares. It sold $74,997,000 of shares, receiving proceeds of $69,507,210, in an offering that closed on September 22, 2009. It was in the wake of this offering  that Wang entered into a lock-up agreement.

113.    It then sold $28,704,070 of shares, receiving proceeds of $27,268,866.50, in an offering that closed on November 23, 2010.

## V.   <u>DEFENDANTS' MISCONDUCT CAUSED PLAINTIFFS' LOSSES</u>

### A.    PLAINTIFFS' LOSSES CAUSED BETWEEN FEBRUARY 2010 AND MAY 2010.

114.    SmartHeat's stock price reached its all-time peak on January 11, 2010, when it traded at $186.00 per share.

115.    In February 2010, SmartHeat's stock price traded between $141.80 and $102.10.

116.    Wang established his four accounts with First Merger in February 2010, and began selling shares on February 24, 2010.

117.    Wang sold 380,000 shares. At the time, SmartHeat had approximately 3,280,000 shares outstanding. Its float, consisting of all tradable shares, was approximately 2,000,000 shares.

118.    Wang thus sold about 19% of *all* previously tradable SmartHeat shares.

119.    Wang sold his shares between February 24, 2010, and August 13, 2010.

120.    Wang's sales accounted for 5% of sales in SmartHeat's stock every trading day.

121.    Wang's sales put steady downward pressure on SmartHeat's stock price. Between February 24, 2010, and May 3, 2010, SmartHeat's stock price drifted down from $123.70 per share to $69.40 per share -- a loss of almost 44%.

122.    After Wang had completed his sales, SmartHeat's share price stabilized, trading between $50 and $75 until a $27 million offering on November 23 reduced the price to around $50 per share.



Wang's false statements that Wang had not sold SmartHeat stock, were violations of the securities laws.

124.    One of the risks caused by violations of the securities laws is that when those violations are discovered, actors including the SEC and the Exchanges on which shares trade will take action that will harm shareholders.

125.    On January 31, 2012, FINRA accepted First Merger personnel's Letters of Acceptance, Waiver, and Consent.

126.    Upon learning of Wang's stock sales, SmartHeat's Board of Directors convened a meeting, one of whose purposes was to address Wang's violations of the securities laws.

127.    On May 30, 2012, at 6.55 A.M. Eastern Standard Time, SmartHeat reported the results of the May 25 meeting, and specifically (a) the reshuffling of Wang's positions at SmartHeat to positions where SmartHeat was not required to report his shareholdings, and (b) SmartHeat's entry into a then-$1,000,000 line of credit with Wang's NorthTech Holdings, Inc.

128.    On May 30, 2012, at 8:23 A.M. -- prior to market opening -- the NASDAQ announced that trading in SmartHeat's shares would be halted. According to a press release issued by SmartHeat on November 9, 2012, NASDAQ's request for information centered on "the restructuring of our board and management and our entry into a secured revolving credit facility" at the May 25, 2012 meeting. Trading was halted at a price of $4.02.

129.    Two of the reasons NASDAQ halted trading in SmartHeat's shares were that Wang and SmartHeat had violated the securities laws, and that when SmartHeat's Board of Directors had discovered the violations, it had chosen to cover them up.

130.    On August 23, 2012, the NASDAQ staff informed SmartHeat that it had decided to "apply more stringent [listing] criteria" to SmartHeat under Listing Rule 5101.

131.    NASDAQ Listing Rule 5101 allows NASDAQ to apply "more stringent criteria" when "any event, condition, or circumstance that exists or occurs" making listing unsuitable. Listing Rule 5101 also provides that this authority is to be used "to maintain the quality of and public confidence in its market, to prevent fraudulent and manipulative acts and practices, to promote just and equitable principles of trade, and to protect investors and the public interest."

132.    Hence, NASDAQ had decided to delist SmartHeat's shares in the public interest.

133.    NASDAQ's concerns included (among others) SmartHeat's "operational structure and *suitability for listing*" (emphasis added).

134.    The public interest required that NASDAQ delist SmartHeat's shares because (a) Wang had violated the securities laws; and (b) SmartHeat's Board of Directors had determined to cover up the violation.

135.    SmartHeat appealed, but on November 9, 2012, SmartHeat announced that the NASDAQ Listing Qualifications Hearings Panel had affirmed the NASDAQ Staff's determination to delist SmartHeat's stock in the public interest. Thus, SmartHeat's shares were delisted effective opening of trading on November 9, 2012.

136.    On November 9, 2012, trading resumed on the Pink Sheets, and that day SmartHeat's stock price fell from $4.02 to $1.30 on unusually heavy volume. Since then, SmartHeat's stock price has traded for between $1.35 and $0.25 per share.

## VI.  PLAINTIFFS' CLASS ACTION ALLEGATIONS

137.    Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a Class consisting of all persons who purchased the common stock of SmartHeat during the Class Period and who were damaged thereby. Excluded from the Class are Defendants, the present and former officers and directors of SmartHeat and any subsidiary thereof, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which any defendant has or had a controlling interest; Benjamin Wey, Robert Newman, the New York Global Group, and any entity in which they have or had a controlling interest, and any subsidiary thereof.

138.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, SmartHeat's stock was actively traded on the NASDAQ.

139.    While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least hundreds, if not thousands, of members in the proposed Class. Members of the Class may

be identified from records maintained by SmartHeat or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice customarily used in securities class actions.

140.    Plaintiffs' claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

141.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

142.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

   a.    whether the federal securities laws were violated by Defendants' acts as alleged herein;

   b.    whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, and financial performance of SmartHeat; and

   c.    to what extent the members of the Class have sustained damages and the proper measure of damages.

143.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to redress individually the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## VII.  RELIANCE PRESUMPTION

144.    Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*,

506 U.S. 128, 92 S. Ct. 2430 (1972). Defendants are charged with material omissions. It is impossible, on a practical basis, to prove reliance on statements that the defendants were required to, but did not, make. The information defendants were required to disclose would have significantly altered the total mix of information available regarding the value of SmartHeat shares.

145.    In the alternative, at all relevant times, the market for SmartHeat common stock was an efficient market for the following reasons, among others:

a.     SmartHeat stock met the requirements for listing, and was listed and actively traded on the NASDAQ under ticker symbol "HEAT". The NASDAQ is a highly efficient and automated markets;

b.     As a regulated issuer SmartHeat filed with the SEC periodic public reports and was eligible to file S-3 registration statements with the SEC during the Class Period, and did file one on November 15, 2010;

c.     SmartHeat regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

d.     SmartHeat was followed by several securities analysts employed by major brokerage firms  including Barclays Capital, BMO Capital Markets, William Blair & Co., LLC, and Rodman & Renshaw, LLC, who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period;

e.     Unexpected material news about SmartHeat was rapidly reflected in and incorporated into the Company's stock price during the Class Period;

f.     During the Class Period, an average of 530,000 shares of SmartHeat common stock were traded weekly. Approximately 17.1% of  the public float and 12.4%

of outstanding shares were traded weekly, giving rise to a very strong presumption of an efficient market.

## VIII.   FIRST CAUSE OF ACTION

### Violation of Section 10(b) of The Exchange Act Against and Rule 10b-5
### Promulgated Thereunder Against Defendants Wang and SmartHeat

146.     Plaintiffs incorporates ¶¶1-145 as if fully set forth herein.

147.     This cause of action is asserted against Defendants Wang and SmartHeat.

148.     During the Class Period, defendants carried out a plan, scheme and course of conduct which was intended to, and throughout the Class Period, did: (1) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (2) cause Plaintiffs and other members of the Class to purchase SmartHeat's securities at artificially inflated and distorted prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, individually and as a group, took the actions set forth herein.

149.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of SmartHeat as specified herein.

150.     Wang's primary liability arises from the following: (a) he was a high-level executives, directors, and agent at the Company during the Class Period and member of SmartHeat's management team; (b) by virtue of his responsibilities and activities as senior officers and director of the Company, he was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections, reports, and SEC filings; (c) he enjoyed significant personal contact and familiarity with the other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, (d) he was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading; and (e) he was aware of his own stock sales, was aware that he and

25

SmartHeat were required to disclose the sales, and was aware that they had not disclosed the sales.

151.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price for SmartHeat's securities was artificially inflated during the Class Period.

152.    In ignorance of the fact that market prices of SmartHeat's publicly-traded securities were artificially inflated or distorted, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the Company's securities trade, and the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, Plaintiffs and the other members of the Class acquired SmartHeat's securities during the Class Period at artificially high prices and were damaged thereby.

153.    At the time of said misrepresentations and omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding SmartHeat's financial results and condition, which were not disclosed by defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired SmartHeat securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices or distorted prices at which they did.

154.    Wang's knowledge and scienter can be imputed to SmartHeat under common-law agency principles.

155.    By virtue of the foregoing, Wang and SmartHeat have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

156.    As a direct and proximate result of the Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

157.     This action was filed within two years of discovery of the fraud and within five years of Plaintiff' purchases of securities giving rise to the cause of action.

## IX.   SECOND CAUSE OF ACTION

### Violation Of Section 20A Of The Exchange Act

### Against Defendant Wang

158.     Plaintiffs incorporate ¶¶1-145 as if fully set forth herein.

159.     This claim is asserted under Section 20A of the Exchange Act against Defendant Wang. This claim is asserted by Stream SICAV on behalf of a Class of persons who bought shares between February 24, 2010, and August 13, 2010.

160.     During the relevant period, Defendant Wang occupied a position with SmartHeat that made him privy to confidential information about SmartHeat. In particular, Defendant Wang was privy to the information that SmarHeat's CEO was in the process of selling half of his holdings of SmartHeat's stock.

161.     Notwithstanding his duty to refrain from trading in SmartHeat's stock unless he disclosed the foregoing material adverse facts to the investing public, Defendant Wang sold $23 million worth of SmartHeat stock during the relevant period. He sold stock on every trading day between February 24, 2010, and August 13, 2010

162.     Defendant Wang sold his SmartHeat securities at prices artificially inflated by the nondisclosure and misrepresentations of material adverse facts which were not known to the investing public, including Plaintiff. Before selling to the public, Defendant Wang was obligated to disclose this information to Plaintiff.

163.     By reason of the foregoing, Defendant Wang directly and indirectly, by use of the means and instrumentalities of interstate commerce, the mails, and the facilities of the national securities exchanges, employed devices, schemes, and artifices to defraud, and engaged in acts and transactions and a course of business which operated as a fraud or deceit upon the Plaintiffs who purchased SmartHeat stock contemporaneously with Defendant Wang's insider sales.

164.    Plaintiffs who purchased SmartHeat stock contemporaneously with the insider sales: (1) have suffered substantial damages because they relied upon the accuracy of Defendants' false and misleading statement and paid artificially inflated prices for SmartHeat securities as a result of the violations of Section 10(b) and Rule 10b-5 alleged herein; and (2) would not have purchased SmartHeat stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements and concealment. At the time of the Plaintiffs' purchases, the fair and true value of SmartHeat common stock was substantially less than the prices paid by them.

165.    As a result of the foregoing, Plaintiff and the Class have suffered substantial damages.

166.    This action is brought within five years of the contemporaneous purchases.

## X.  THIRD CAUSE OF ACTION

### Violation of Section 20(a) against the Cover-Up Defendants

167.    Plaintiff incorporates ¶¶1-145 as if fully set forth herein.

168.    This second cause of action is asserted against each of the Cover-Up Defendants.

169.    The Cover-Up Defendants acted as controlling persons of SmartHeat within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, agency, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of aspects of the Company's revenues and earnings and dissemination of information to the investing public, the Cover-Up Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiffs contend are false and misleading. The Cover-Up Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

170.    In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

171.    The Cover-Up Defendants either participated in the May 24-25 meeting, or had actual knowledge of the May 24-25 meeting.

172.    As set forth above, SmartHeat and Defendant Wang each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.

173.    By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act, as they culpably participated in the fraud alleged herein. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

174.    This action was filed within two years of discovery of the fraud and within five years of Plaintiffs' purchases of securities giving rise to the cause of action.

**JURY TRIAL DEMANDED**

Plaintiffs hereby demand a trial by jury.

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

a.    Determining that this action is a proper class action and certifying Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff' counsel as Class Counsel;

b.     Awarding compensatory damages in favor of Plaintiffs  and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

c.       Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

d.       Ordering an accounting of Defendant Wang's insider-trading proceeds;

e.       Awarding Plaintiffs equitable/injunctive and further relief under Section 20A of the Exchange Act; and

f.       Awarding Plaintiffs such other and further relief as the Court may deem just and proper.

Dated: January 28, 2013                    Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

Laurence M. Rosen, Esq. (LR5733)
Phillip Kim, Esq. (PK 9384)
Jonathan Horne (JH 7258)
THE ROSEN LAW FIRM, P.A.
275 Madison Avenue, 34th Floor
New York, NY, 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: lrosen@rosenlegal.com

*Lead Counsel for Plaintiffs and the Putative Class*

# EXHIBIT 1

CERTIFICATION

Certification and Authorization of Named Plaintiff Pursuant to Federal Securities Laws

The individual or institution listed below (the "Plaintiff") authorizes and, upon execution of the accompanying retainer agreement by The Rosen Law Firm P.A., retains The Rosen Law Firm P.A. to file an action under the federal securities laws to recover damages and to seek other relief against SmartHeat, Inc., Inc. The Rosen Law Firm P.A. will prosecute the action on a contingent fee basis and will advance all costs and expenses. The SmartHeat, Inc., Inc. Retention Agreement provided to the Plaintiff is incorporated by reference, upon execution by The Rosen Law Firm P.A.

First Name:  Tien

Middle Initial:  N

Last Name:  Chung

Mailing Address:  REDACTED

City:

State:

Zip Code:

Country:

Phone:

Email:

The Plaintiff Certifies that:

1. Plaintiff has reviewed the complaint and authorized its filing.

2. Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3. Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4. Plaintiff represents and warrants that he/she/it is fully authorized to enter into and execute this certification.

5. Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

6. Plaintiff has made no transaction(s) during the Class Period in the debt or equity securities that are the subject of this action except those set forth below:

**Shares Purchased**

| Type of Security | Buy Date | # of Shares: | Price per Share |
|---|---|---|---|
| Common Stock | 2010-04-01 | 3305 | 11.99 |

7. I have not served as a representative party on behalf of a class under the federal security laws during the last three years, except if detailed below.
Tien Chung

I declare under penalty of perjury, under the laws of the United States, that the information entered is accurate: Yes

I intend to sign and execute this agreement and retain the Rosen Law Firm, P.A. to proceed on Plaintiff's behalf, on a contingent fee basis: Yes

Date of signing [06/21/2012]

CERTIFICATION

Certification and Authorization of Named Plaintiff Pursuant to Federal Securities Laws

The individual or institution listed below (the "Plaintiff") authorizes and, upon execution of the accompanying retainer agreement by The Rosen Law Firm P.A., retains The Rosen Law Firm P.A. to file an action under the federal securities laws to recover damages and to seek other relief against SmartHeat, Inc., Inc. The Rosen Law Firm P.A. will prosecute the action on a contingent fee basis and will advance all costs and expenses. The SmartHeat, Inc., Inc. Retention Agreement provided to the Plaintiff is incorporated by reference, upon execution by The Rosen Law Firm P.A.

First Name: Dharanendra

Last Name: Rai

Mailing Address: REDACTED

City:

State:

Zip Code:

Country:

Phone:

Email:

The Plaintiff Certifies that:

1. Plaintiff has reviewed the complaint and authorized its filing.

2. Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3. Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4. Plaintiff represents and warrants that he/she/it is fully authorized to enter into and execute this certification.

5. Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

6. Plaintiff has made no transaction(s) during the Class Period in the debt or equity securities that are the subject of this action except those set forth below:

**Shares Purchased**

| Type of Security | Buy Date | # of Shares: | Price per Share |
|---|---|---|---|
| Common Stock | 2011-03-01 | 200 | 45.04 |
| Common Stock | 2010-11-18 | 20 | 50.80 |
| Common Stock | 2010-09-11 | 80 | 77.60 |
| Common Stock | 2010-18-11 | 100 | 50.04 |
| Common Stock | 2010-11-11 | 50 | 69 |
| Common Stock | 2010-11-11 | 50 | 69.9 |

7. I have not serve as a representative party on behalf of a class under the federal security laws during the last three years, except if detailed below.
NA

I declare under penalty of perjury, under the laws of the United States, that the information entered is accurate: Yes

I intend to sign and execute this agreement and retain the Rosen Law Firm, P.A. to proceed on Plaintiff's behalf, on a contingent fee basis: Yes

Date of signing [06/28/2012]

## CERTIFICATE OF SERVICE

I, Jonathan Horne, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury as follows:

I am an attorney at The Rosen Law Firm, P.A. I am over the age of eighteen. On January 28, 2013, I served the foregoing FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS by U.S. mail to counsel of record for the defendants at the addresses listed below:

Gene Frett
Sperling & Slater
55 West Monroe St.
Suite 3200
Chicago, IL 60603

-and-

James Kopecky
Kopechy, Schumacher, Bleakley, Rosenburg, P.C.
203 N. LaSalle St. Suite 1620
Chicago, IL 60601

Counsel for defendant SmartHeat, Inc.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 28, 2013, in New York, NY

/s/ Jonathan Horne

31