UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X
                                       :

STREAM SICAV, DHARANENDRA RAI, and TIEN     :
CHUNG, Individually and on Behalf of All Others Similarly :
Situated,                                   :          12 Civ. 6682 (PAE)
                                         :
                           Plaintiff,        :        OPINION & ORDER
                -v-                        :

JAMES JUN WANG, SMARTHEAT, INC., and JOHN    :
DOES 1–4                                      :
                           Defendants.     :
                                       :
------------------------------------------------------------------------X

PAUL A. ENGELMAYER, District Judge:

       In this putative class action, lead plaintiff Stream SICAV and named plaintiffs

Dharanendra Rai and Tien Chung (collectively "Stream SICAV" or "plaintiffs") allege that

defendants SmartHeat, Inc. ("SmartHeat") and James Jun Wang violated § 10(b) of the

Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and the United States

Securities and Exchange Commission's implementing rule, 17 C.F.R. § 240.10b-5 ("Rule 10b-

5").[1]  Stream SICAV alleges that SmartHeat and Wang omitted to reveal information that

rendered materially false and misleading statements the company had previously made to

investors with regard to a lock-up agreement that SmartHeat had announced to boost shareholder

confidence.  First, Stream SICAV alleges that, although SmartHeat had announced that its senior

management was barred by agreement from selling shares of company stock until 2012, the

defendants failed to disclose a secret amendment to the lock-up agreement that permitted insiders

---

[1] In their second cause of action, plaintiffs allege that Wang and John Does 1–4 violated § 20A
of the Exchange Act, 15 U.S.C. § 78t-1.  SAC ¶¶ 137–145.  Because Wang has not been served,
and the John Does have not been identified, no challenge to that cause of action has been made.

to sell SmartHeat shares, effective January 1, 2010.  Second, Stream SICAV alleges, defendants failed to disclose pre-2012 sales of 380,000 of the purportedly locked-up shares.

Three motions are presently pending:  (1) SmartHeat's motion to dismiss the Second Amended Complaint ("SAC") for failure to state a claim, pursuant to Federal Rule of Civil Procedure 12(b)(6); (2) Stream SICAV's motion to strike an exhibit which defendants submitted in support of that motion; and (3) Stream SICAV's motion to permit alternative service of Wang under Federal Rule of Civil Procedure 4(f)(3).  For the reasons that follow, the Court denies defendants' motion to dismiss, denies Stream SICAV's motion to strike, and grants Stream SICAV's motion for alternative service.

## I.    Background

### A.  Facts Alleged in the SAC[2]

SmartHeat, Inc. ("SmartHeat") is a Nevada holding company whose subsidiaries operate primarily in China.  SAC ¶¶ 1, 31.  SmartHeat "designs, manufactures, and sells clean technology plate heat exchangers and related systems in China."  *Id.* ¶ 31.  Its technology is used in commercial and residential buildings.  *Id.* ¶ 32.

Wang founded SmartHeat and, until May 25, 2012, served as its CEO and board chairman.  *Id.* ¶ 29.  He remains chairman and CEO of SmartHeat's principal subsidiary,

---

[2] For the purpose of resolving the motion to dismiss, the Court assumes all facts pled in the SAC (Dkt. 52) to be true, drawing all reasonable inferences in favor of the plaintiff.  *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

The following abbreviations are used herein for the parties' memoranda of law:  (1) Defendant SmartHeat, Inc.'s Motion to Dismiss the Second Amended Complaint ("Def. Br.") (Dkt. 55); (2) Opposition to Motion to Dismiss ("Pl. Br.") (Dkt. 57); (3) Defendant SmartHeat, Inc.'s Reply in Support of its Motion to Dismiss ("Def. Reply Br.") (Dkt. 62); (4) Plaintiff's Motion for Alternate Service of Defendant James Jun Wang Under Rule 4(f)(3) ("Pl. Serv. Br.") (Dkt. 67); (5) Defendant SmartHeat, Inc.'s Opposition to Motion for Alternate Service of James Jun Wang ("Def. Serv. Br.") (Dkt. 68); and (6) Plaintiffs' Reply in Further Support of Motion for Alternate Service Under Rule 4(f)(3) ("Pl. Serv. Reply Br.") (Dkt. 69).

SmartHeat Taiyu (Shenyang) Energy Technology Co., Ltd. ("Taiyu,") which he founded in 2002. *Id.* ¶¶ 29–30.

On January 29, 2009, SmartHeat's stock started trading on the NASDAQ stock exchange. *Id.* ¶ 3. That same day, SmartHeat announced that its senior management had entered into a lock-up agreement that prevented them from selling any shares until 2012. *Id.* The locked-up shares represented approximately 61% of SmartHeat's outstanding common stock. *Id.* ¶ 53. That day, SmartHeat issued a press release that quoted Wang as saying, "Our entire senior management team has voluntarily entered into share lock-ups as a reflection of our great confidence in the prospect of SmartHeat." *Id.* ¶ 49.

Throughout 2009, SmartHeat continued to tout the lock-up agreement. On July 7, 2009, SmartHeat issued a press release in which Wang stated, "As SmartHeat's largest shareholders, our management team has voluntarily locked up their entire shareholdings for 3 years until January 2012. Our vested interest is with our shareholders. SmartHeat is highly sensitive to shareholder dilution in any financing activities." *Id.* ¶ 51. On August 9, 2009, SmartHeat made a presentation to investors, urging them to buy shares in the company in part based on the lock-up agreement. *Id.* ¶ 52. On September 22, 2009, SmartHeat sold investors 833,000 shares of stock for net proceeds of more than $69 million. *Id.* ¶ 55. On September 28, 2009, William Blair & Co., which had underwritten the September 22, 2009 offering, issued a research report on SmartHeat. It stated that the lock-up agreement "strengthens the company's corporate governance and investor perception by aligning management's interests with those of shareholders." *Id.* ¶¶ 53–54. As of April 8, 2013, the date of the SAC, both the August 9, 2009 investor presentation and William Blair's September 28, 2009 report remained available on SmartHeat's website. *Id.* n.3–4.

On January 11, 2010, SmartHeat's stock price reached its all-time peak, at $186 per share.  *Id.* ¶ 95.  During February 2010, SmartHeat's stock price ranged from between $102.10 and $141.80 per share.  *Id.* ¶ 96.

On February 5, 2010, Wang and senior management entered into an Amended and Restated Lock-Up Agreement.  It stated that the lock-up agreement had been terminated on January 1, 2010, a month earlier.  *Id.*  ¶ 6.  The revised lock-up agreement was, however, not disclosed to shareholders.  *Id.* ¶ 13.

Between February 2010 and August 13, 2010, Wang, working through SmartHeat's counsel, Robert Newman, caused 380,000 locked-up SmartHeat shares to be sold secretly for $23 million.  *Id.* ¶¶ 7, 57.  Those shares, which had been subject to the earlier lock-up agreement, had been freed from that restriction by the undisclosed February 5, 2010 agreement.  The 380,000 shares accounted for 19% of the locked-up shares.  *Id.* ¶ 7.  The SAC does not state concretely to whom the 380,000 belonged, only that they were owned by "SmartHeat insiders." *Id.*

Because the mechanics of these sales form a focus of defendants' motion to dismiss, the Court reviews here plaintiffs' allegations as to those sales in detail.  Specifically, the SAC alleges, Wang told First Merger Capital, Inc. ("First Merger") that four SmartHeat insiders would be selling their stock.  *Id.* ¶ 58.  Then, in February 2010, at Wang's direction, Newman created four accounts with First Merger, each in the name of a SmartHeat insider.  Three insiders had annual incomes between $25,000 and $50,000, and the fourth had an annual income between $50,000 and $100,000; all four had net worths between $50,000 and $100,000 and liquid net worths between $25,000 and $50,000.  *Id.*  The SAC does not identify these insiders.  On February 5, 2010, Wang obtained powers of attorney over the four accounts.  *Id.* ¶ 60.  On

February 18, 2010, 380,000 shares of SmartHeat stock were deposited in the four accounts.  *Id.* ¶ 62.  On February 24, 2010, Wang, through Newman, ordered First Merger to begin selling the stock in increments of 5% of SmartHeat's daily trading volume.  *Id.* ¶ 63.  Between February 24, 2010 and August 13, 2010, First Merger sold the shares for a total of $23 million.  *Id.* ¶ 8.  First Merger never communicated directly with any of the four insiders.  *Id.* ¶ 59.  Instead, First Merger sent Wang weekly progress reports on the stock sales.  *Id.* ¶ 11.

In exchange for the sales, First Merger received a commission of $1.1 million.  *Id.* ¶ 10. The SAC alleges that this commission was unreasonably high by commercial standards.  It alleges that the circumstances of the sales initiated by Wang supplied reasonable grounds to infer that a SmartHeat insider was selling shares in violation of the securities laws, and that First Merger therefore had been under an obligation to file a Suspicious Activity Report, *see* 31 C.F.R. § 103.19.  The SAC alleges that Wang paid the $1.1 million commission to induce First Merger not to file such a report.  *Id.* ¶¶ 66–68.

The sales of the 380,000 shares "put steady downward pressure on SmartHeat's stock price."  *Id.* ¶ 102.  "Between February 24, 2010, and May 3, 2010, SmartHeat's stock price fell from $123.70 per share to $69.40 per share – a loss of almost 44 percent."  *Id.*

In late 2011, the Financial Industry Regulatory Authority (FINRA) charged First Merger and five First Merger employees with failure to report the suspicious sales.  *Id.* ¶ 14.  In early 2012, the employees "accepted FINRA's allegations."  *Id.* ¶ 15.

On May 25, 2012, following a two-day meeting of SmartHeat's board, Wang resigned as CEO.  *Id.* ¶ 16.  He maintained his positions at SmartHeat's subsidiaries, including as chairman and CEO of Taiyu, SmartHeat's principal subsidiary.  *Id.* ¶ 29.  At the same time, SmartHeat obtained a $2 million revolving line of credit with a 1.25% per month interest rate and a 4%

origination fee from a company at which Wang was a principal, Northtech. *Id.* ¶ 17. The line of credit was secured by most of SmartHeat's assets. *Id.*

On May 30, 2012, SmartHeat reported the results of its May 25, 2012 board meeting. *Id.* ¶ 18. Several hours later, NASAQ halted trading in SmartHeat's shares, seeking information regarding "the restructuring of [SmartHeat's] board and management and [SmartHeat's] entry into a secured revolving credit facility." *Id.* NASDAQ then delisted SmartHeat. *Id.* ¶ 19. When trading of SmartHeat's stock resumed, this time on the pink sheets rather than on the NASDAQ, SmartHeat's share price fell from $4.04 to $1.30 on the first day. *Id.* ¶ 20. Between then and the filing of the SAC, SmartHeat's stock price traded at between $0.25 and $1.35 per share. *Id.* ¶ 115.

### B. Procedural History

#### 1. The Amended Complaints

On August 31, 2012, the initial Complaint in this case was filed, by putative lead plaintiff Steve Leshinsky. Dkt. 1. On December 14, 2012, the Court appointed Stream SICAV, an institutional investment fund incorporated in Luxembourg, Dkt. 12 at 1, 7, to serve as lead plaintiff. Dkt. 18. On January 28, 2013, Stream SICAV, Rai, and Chung filed the First Amended Complaint. Dkt. 22. On April 1, 2013, SmartHeat moved to dismiss. Dkt. 43–48.

On April 8, 2013, plaintiffs filed the SAC. Dkt. 52–53. It contained two claims. The first, under § 10(b) of the Exchange Act and Rule 10b-5, alleged that SmartHeat and Wang had made false statements and material omissions to the effect that insiders' shares were locked up; these statements and omissions allegedly inflated SmartHeat's stock price. The second, under Section 20 of the Exchange Act, was brought against Wang and defendants identified as "John Does 1–4," the insiders in whose names Wang had allegedly caused the 380,000 purportedly

locked-up shares to be sold.  It alleged that these defendants had sold SmartHeat stock at an

artificially inflated price, without disclosing in advance a material fact (that the lock-up

agreement as announced was no longer in effect).

### 2.  SmartHeat's Motion to Dismiss

On May 8, 2013, SmartHeat moved to dismiss the SAC.  Dkt. 54–56.  It argued that (1)

plaintiffs had not plausibly alleged that locked-up shares had been sold, because the lock-up

agreement pertained only to "senior managers," whereas plaintiffs had alleged that SmartHeat

"insiders"—who were not necessarily senior managers—had sold the 380,000 shares, and it was

implausible to infer that the selling insiders were senior managers; and (2) Wang's scienter

cannot be attributed to SmartHeat because Wang's actions were contrary to SmartHeat's

interests.  Wang and the John Doe defendants, having not been served, did not move to dismiss.

On May 22, 2013, Stream SICAV opposed the motion to dismiss.  Dkt. 57, 59.  On June

10, 2013, SmartHeat filed its reply.  Dkt. 62.

### 3.  Stream SICAV's Motion to Strike

On the same day it filed its opposition, Stream SICAV moved to strike Exhibit A to

SmartHeat's counsel's declaration in support of its motion to dismiss.  Dkt. 60.  The declaration

attests that Exhibit A is a copy of a certified list of SmartHeat stockholders as of December 31,

2012. Dkt. 59.  SmartHeat had cited that list as ostensible proof that all members of SmartHeat's

senior management team, including Wang, continued to hold all of their shares. This, SmartHeat

argued, made implausible plaintiffs' allegation that senior management had sold shares in

violation of the lock-up agreement.  In its motion to strike, Stream SICAV argued that the Court

cannot take judicial notice of Exhibit A because (1) it is not integral to the SAC and (2) its

authenticity is not beyond dispute, and in any event that the Court cannot consider Exhibit A for the truth of the matters asserted in it.

On June 10, 2013, SmartHeat filed an opposition to Stream SICAV's motion to strike. Dkt. 63.  On June 12, 2013, Stream SICAV replied.  Dkt. 64.

### 4.   Stream SICAV's Motion for Alternative Service of Wang

On July 24, 2013, plaintiffs moved for permission to effect alternative service of Wang pursuant to Rule 4(f)(3).  Dkt. 66–67.  Plaintiffs seek to serve Wang by serving SmartHeat's registered agent and counsel.  Plaintiffs argued that such service complies with Rule 4(f)(3) in that it is not barred by any international agreement and comports with due process.  Plaintiffs argued that the Court should exercise its discretion to authorize this service because it was not practical to have expected plaintiffs to have served, or to serve, Wang through the Hague Convention.  On August 7, 2013, SmartHeat filed its opposition.  Dkt. 68.  On August 14, 2013, Stream SICAV replied.  Dkt. 69.

## II.    SmartHeat's Motion to Dismiss

### A.   Applicable Legal Standards

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim will only have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009).  A complaint is properly dismissed, where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558.  Accordingly, a district court must accept as true all well-pleaded factual allegations in the complaint, and draw all inferences

in the plaintiff's favor. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) ("*ATSI*"). However, that tenet "is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. A pleading that offers only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

"Securities fraud claims are subject to heightened pleading requirements that the plaintiff must meet to survive a motion to dismiss." *ATSI*, 493 F.3d at 99; *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). A complaint alleging securities fraud must meet the requirements of Federal Rule of Civil Procedure 9(b). *See ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009). Rule 9(b) requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). Specifically, Rule 9(b) requires that a complaint "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *ATSI*, 493 F.3d at 99 (citation omitted). "Allegations that are conclusory or unsupported by factual assertions are insufficient." *Id.*

A complaint alleging securities fraud must also comply with the pleading requirements of the Private Securities Litigation Reform Act (the "PSLRA"), 15 U.S.C. § 78u–4(b). *See Lewy v. Skypeople Fruit Juice, Inc.*, No. 11 Civ. 2700 (PKC), 2012 WL 3957916, at *7 (S.D.N.Y. Sept. 10, 2012) ("Courts must dismiss pleadings that fail to adhere to the requirements of the PSLRA."). In particular, where a plaintiff's claims depend upon allegations that the defendant has made an untrue statement of material fact or that the defendant omitted a material fact necessary in order to make the statements not misleading, the plaintiff "shall specify each statement alleged to have been misleading, the reason or reasons why the statement is

misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1). Thus, in order to plead a claim of securities fraud, plaintiffs "must do more than say that the statements . . . were false and misleading; they must demonstrate with specificity why and how that is so." *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004); *see also In re Austl. & N.Z. Banking Grp. Ltd. Sec. Litig.*, No. 08 Civ. 11278 (DLC), 2009 WL 4823923, at *7 (S.D.N.Y. Dec. 14, 2009).

In addition, a plaintiff pleading scienter in a securities fraud action "shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). "For an inference of scienter to be strong, 'a reasonable person [must] deem [it] cogent and *at least as compelling* as any opposing inference one could draw from the facts alleged.'" *ATSI*, 493 F.3d at 99 (quoting *Tellabs*, 551 U.S. at 324) (alteration and emphasis in original).

**B. Discussion**

Section 10(b) of the Exchange Act makes it unlawful to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. § 78j(b). The implementing rule, Rule 10b-5, in turn, provides that it is unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5. To state a claim for securities fraud under § 10(b) and Rule 10b-5, a plaintiff must, therefore adequately plead these six elements: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or

omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or

omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, LLC v.

Scientific–Atlanta*, 552 U.S. 148, 157 (2008).  Here, SmartHeat moves to dismiss on the grounds

that the SAC fails adequately to plead two elements: misrepresentation and scienter.

### 1.  Misrepresentation

The SAC, fairly read, alleges two instances during the class period in which SmartHeat

failed to disclose new information which allegedly rendered materially false or misleading the

company's original statements about the lock-up agreement.  SAC ¶¶ 3–5.  First, on February 5,

2010, defendants secretly revised the lock-up agreement, so as to permit insiders to sell

SmartHeat stock, effective the previous month.  Stream SICAV alleges that the nondisclosure of

this revision made SmartHeat's previous statements to the effect that insider shares were locked

up until 2012 materially false and misleading.  *Id.* ¶ 6.  The Court refers to this theory of liability

as the "revision theory."  Second, between February 2010 and August 13, 2010, Wang caused

380,000 previously locked-up SmartHeat shares to be secretly sold, for $23 million.  *Id.* ¶¶ 7, 57.

Stream SICAV alleges that the company's failure to disclose these sales concealed from

investors that the earlier lock-up agreement was no longer in effect.  *Id.* ¶ 69.  The Court refers to

this theory of liability as the "insider sale theory."

In moving to dismiss, SmartHeat focuses exclusively on the insider sale theory.  It makes

no attempt to challenge the revision theory of liability as inadequately pled.  In the interest of

completeness, however, the Court *sua sponte* evaluates that theory as well.

### a.  The Revision Theory of Liability

Stream SICAV alleges that on February 5, 2010, SmartHeat revoked the lock-up

agreement, effective January 1, 2010, *id.* ¶ 6, but never corrected its original statements

regarding that agreement, *id.* ¶ 69.  On the contrary, Stream SICAV alleges, SmartHeat effectively reiterated those statements, by leaving up on its website three items that reiterated the lock-up policy.  One was the July 7, 2009 press release.  *See id.* ¶ 5; 7/7/09 Press Release, available at http://www.smartheatinc.com/web/news20090707.asp ("As SmartHeat's largest shareholders, our management team has voluntarily locked up their entire shareholdings for 3 years until January 2012").  The second was the August 9, 2009, presentation to investors.  *See* SAC ¶ 52.  The third was the September 28, 2009 report by William Blair & Co.  *See id.* ¶¶ 53–54.  As a result, Stream SICAV alleges, purchasers who bought shares of SmartHeat after February 5, 2010 did so in reliance on a representation, to wit, that company insiders were barred until 2012 from selling locked-up shares, that was no longer true.

This theory of liability states a claim under § 10(b).  It is well-settled that, "when defendants knowingly or recklessly fail to follow policies announced in their public filings, they may 'cause[ ] those filings to be materially misleading in that the disclosed policy no longer reflect[s] actual practice.'"  *Lewy*, 2012 WL 3957916, at *20 (quoting *Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000)).  In *Novak*, for example, plaintiffs alleged that the defendant clothing company's practice of "refusing to mark down inventory they knew to be 'worthless' . . . violated the Company's own markdown policy, as stated in the Company's public filings"; this theory, the Second Circuit held, stated a claim.  216 F.3d at 311.  Similarly, in *Rothman v. Gregor*, plaintiffs stated a claim when they alleged that the defendant computer company had failed "to follow an announced policy of expensing royalty advances, thereby artificially inflating financial results."  220 F.3d 81, 91 (2d Cir. 2000).  *See also In re Sadia, S.A. Securities Litigation*, 643 F. Supp. 2d 521, 532 (S.D.N.Y. 2009) ("[P]laintiffs' allegations regarding Sadia's failure to reveal that it had entered into currency hedging contracts in violation of its internal

[and publicly announced] hedging policy suffice to state a Rule 10b-5 claim.").  As these cases reflect, where a company announces but then disregards a policy, the company's failure to correct its stated policy can be materially misleading.

The SAC fairly pleads that SmartHeat's revocation of the lock-up agreement, freeing its management team to sell its shares, was material to potential purchasers of its stock.  "For a misstatement or omission to qualify as material, 'there must be a substantial likelihood that' a complete and truthful disclosure 'would have been viewed by [a] reasonable investor as having significantly altered the 'total mix' of information made available.'"  *New Jersey Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC*, 709 F.3d 109, 126 (2d Cir. 2013) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988)).  And SmartHeat's conduct, as alleged, evidences the materiality of its lock-up policy.  The company repeatedly touted that policy as a reason for purchasers to buy, and hold, company stock.  SmartHeat had told investors that its management team's commitment to hold its shares until 2012 reflected their confidence in the company and aligned shareholder interests with management's.  *See, e.g.,* SAC ¶¶ 49, 51, 52.  It follows that SmartHeat's decision to abandon that policy was also material.  Moreover, the lock-up agreement affected a majority (61%) of the company's outstanding shares.  *Id.* ¶ 11.  A commitment to take 61% of a company's shares off the market for several years—and the reversal of that commitment—"significantly alter[s] the 'total mix' of information made available."  *New Jersey Carpenters*, 709 F.3d at 126.  Stream SICAV's allegation that SmartHeat secretly revoked its touted lock-up policy in February 2010 therefore alleges a material misrepresentation.

b.  The Insider Sale Theory of Liability

SmartHeat trains its motion to dismiss on the SAC's insider sale theory of liability, to wit, that Wang caused SmartHeat insiders secretly to sell locked-up shares in breach of the announced lock-up agreement.  SmartHeat defends these sales as consistent with the announced policy.  It notes that its public statements represented only that its *senior management* had entered into the lock-up agreement, Def. Br. 2, 6; SAC ¶ 3, whereas the SAC alleges that SmartHeat "insiders," *i.e.,* John Does 1–4, not SmartHeat's senior management *per se*, sold shares.  Thus, SmartHeat argues, its conduct as alleged did not violate its announced policy, and hence there was no material misrepresentation.  Def. Br. 2–3, 6–8; SAC ¶ 7.  SmartHeat argues that, for three reasons, the SAC's implication that the insiders who sold shares were members of senior management, SAC ¶¶ 7, 32, 57–68, 100–103, is implausible.  Def. Br. 6–8.

First, SmartHeat notes, the SAC identifies "the four 'insiders' [as] 'current and former' SmartHeat employees."  *Id.* at 7 (citing SAC ¶ 65).  That some of these insiders were "former" employees, SmartHeat argues, "contradicts Plaintiffs' implication that these insiders were part of the senior management team," because, SmartHeat states, one cannot be both a senior manager and a former employee.  *Id*.  This logic is unpersuasive.  The designation of the insiders as including "former employees" appears only in an earlier version of the Complaint, *see* First Amended Complaint ¶ 66, not the SAC, which is the current operative pleading.  More fundamentally, the "current and former employees" formulation does not bear the freight to which SmartHeat assigns it.  Litigants commonly use the broad phrase "current and former employees" when referring to employees whose identities (and hence employment status) are unknown.  The phrase does not necessarily connote that certain persons in that group have, in fact, left the company.

14

Second, SmartHeat argues that the four insiders cannot be senior management, because their incomes, as alleged in the SAC, do not match those of SmartHeat's three-member senior management team, as identified by SmartHeat in its motion to dismiss.  The SAC alleges that "[t]hree insiders who Wang claimed owned the accounts had annual incomes between $25,000 and $50,000, and the fourth had an income between $50,000 and $100,000."  SAC ¶ 58.  By contrast, SmartHeat argues, its "senior management" consisted, as of 2010, of Wang, Wenbin Lin, and Yang In Cheol, and these three officials each earned more income than that attributed to the four insiders.  But SmartHeat's say-so in its brief as to whom its senior management (an undefined term) consisted of and what their 2010 incomes were is not cognizable on a motion to dismiss.[3]

Third, SmartHeat argues that its senior management team cannot have been the insiders who sold shares because, it asserts, these three senior managers purportedly continue to hold the same number of shares of SmartHeat as at the time of the lock-up agreement.  Def. Br. 7.  In support of this claim, SmartHeat cites (1) its 2010 Form 10-K, representing the number of shares held by each of the three senior managers as of March 19, 2009, Kopecki Decl. Ex. B, and (2) a Certified Stock Holder's List, issued by a transfer agent, purporting to show the shares that the three held as of December 31, 2012, Kopecki Decl. Ex. A.  But, as Stream SICAV noted in its motion to strike (Dkt. 60), the stockholder list cannot be considered for the truth of the matters

---

[3] As plaintiffs note, neither SmartHeat's January 29, 2009 press release, nor its cognizable public filings, define its "senior management."  Pl. Br. 9.  Plaintiffs also note that SmartHeat's claim that the senior management team consisted solely of Wang, Lin, and Cheol is, arguably, in tension with SmartHeat's other filings.  SmartHeat represented at the time of the lock-up agreement that its senior management team held 61% of its outstanding common stock.  Horne Decl. Ex. 2.  By contrast, its public filings, according to plaintiffs, represented that Wang, Lin and Cheol collectively owned at most 56.48% of that stock, *id.* at 11 (referring to Kopecky Decl. Ex. B).  This left, plaintiffs claim, room for there to be one or more other members of "senior management."

asserted therein.  *See*, *e.g.*, *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008) (on motion to dismiss, "it is proper to take judicial notice of the fact that press coverage, prior lawsuits, or regulatory filings contained certain information, without regard to the truth of their contents"); *Global Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006) ("[A]lthough [certain court documents] may be public records of which a court may take judicial notice, it may do so on a motion to dismiss only to establish the existence of the opinion, not for the truth of the facts asserted in the opinion.") (citation omitted); *Kramer v. Time Warner Inc.*, 937 F.2d 767, 773–74 (2d Cir. 1991) (SEC filings can be considered on a motion to dismiss only for the fact that the statements they contain were made, not for the truth of the matter asserted).[4]

More fundamentally, SmartHeat's argument that the insiders in whose names the 380,000 shares were allegedly sold were not the senior managers who owned those shares fails to engage with the core allegation underlying the insider sale theory of liability.  The SAC unambiguously alleges that the 380,000 shares sold by First Merger, regardless of the identities of the four insiders in whose names they were sold, were locked-up shares.  SAC ¶ 7.  On that basis, it alleges, the sale of those shares made SmartHeat's repeated representations about an extant (and presumably effective) lock-up agreement untrue.  That claim does not require the company insiders in whose names the locked-up shares were sold to have been senior managers.

To be sure, the SAC does not allege to which senior managers the 380,000 shares belonged (although there is some suggestion that Wang may have caused some of his locked-up shares to be sold under others' names).  But it is not necessary, nor necessarily realistic, to expect

---

[4] In any event, that senior managers held a particular number of shares on December 31, 2012 does not establish how many shares they held in August 2010, at the end of the six-month period of alleged insider sales.  An insider could have sold those shares during that 2010 period and then later repurchased shares.

plaintiffs to trace ownership of those shares at this pre-discovery stage.  That issue will presumably be resolved in discovery.  At this stage, the issue is whether the SAC has plausibly alleged that the 380,000 shares sold by First Merger were locked-up shares, notwithstanding SmartHeat's public representation that sales of such shares were embargoed.  The SAC has done so.  Stream SICAV's insider sale theory of liability thus, like its revision theory of liability, states a claim.

### 2.  Scienter

SmartHeat also challenges the SAC's allegations of scienter.  It does not dispute that scienter is adequately pled as to CEO Wang, but it argues that Wang's scienter cannot be imputed to SmartHeat.  Although, under New York law, the knowledge of an agent such as a corporate executive is generally imputed to the principal, SmartHeat argues that the SAC depicts Wang as having "acted entirely in his own interests and adversely to the interests of the corporation," *Wight v. BankAmerica Corp.*, 219 F.3d 79, 87 (2d Cir. 2000), so as to implicate the "adverse interest" exception to such imputation.  Def. Br. 4–5.

The Court holds otherwise.  The adverse interest exception to such imputation is narrow and inapplicable here:  "The crucial distinction is between conduct that defrauds the corporation and conduct that defrauds others for the corporation's benefit. . . .  [W]hen insiders defraud third parties *for* the corporation, the adverse interest exception is not pertinent. . . .  So long as the corporate wrongdoer's fraudulent conduct enables the business to survive—to attract investors and customers and raise funds for corporate purposes—this test is not met."  *Kirschner v. KPMG LLP*, 15 N.Y.3d 446, 467–68 (2010) (emphasis in original).  Here, Wang's alleged failure to correct his and SmartHeat's public statements about an extant lock-up agreement did not operate as a fraud on the corporation; rather, as alleged, it defrauded the investing public.  And the SAC

plausibly alleges that SmartHeat benefited by concealing management's stock sales:  SmartHeat

itself had repeatedly touted the fact that management's shares were locked up as a means of

boosting investor confidence in the company, thereby keeping SmartHeat's stock price high.

*See*, *e.g.*, SAC ¶¶ 3–5, 49–55.  By hiding from investors the fact that the lock-up had been

abandoned, Wang and SmartHeat preserved this confidence.  As a result, the SAC alleges, on

November 23, 2010, three months after the secret sale of the 380,000 locked-up shares,

SmartHeat was able to sell shares for $28.7 million, of which it received $27.3 million, almost $5

million more than its overall income from operations in 2010.  SAC ¶ 72.  Thus, the SAC fairly

alleges that, by concealing its repudiation of the lock-up agreement, SmartHeat has continued "to

survive—to attract investors and customers and raise funds for corporate purposes." *Kirschner*,

15 N.Y.3d at 468.[5]  Stream SICAV has adequately pled scienter.

## IV.   Stream SICAV's Motion for Alternative Service of Wang

### A.  Applicable Legal Standards

Under Federal Rule of Civil Procedure 4(f), service may be effected upon individuals in

foreign countries by: (1) "any internationally agreed means of service that is reasonably

calculated to give notice, such as those authorized by the [Hague Convention]"; (2) "a method

that is reasonably calculated to give notice," for example, "as the foreign authority directs in

response to a letter rogatory"; or (3) "other means not prohibited by international agreement, as

the court orders."  Fed. R. Civ. P. 4(f)(1)–(3).  Under the third of these, Rule 4(f)(3), "a Court

may fashion means of service on an individual in a foreign country, so long as the ordered means

of service (1) is not prohibited by international agreement; and (2) comports with constitutional

---

[5] The adverse interest exception is similarly narrow in Nevada, where SmartHeat is incorporated. *See In re Amerco Derivative Litig.*, 252 P.3d 681, 695 (Nev. 2011) (quoting from and relying extensively on *Kirschner*, 15 N.Y.3d at 466–67).

notions of due process." *SEC v. Anticevic*, No. 05 Civ. 6991 (KMW), 2009 WL 361739, at *3 (S.D.N.Y. Feb. 13, 2009) (citation omitted).

It is well established that "there is no hierarchy among the subsections in Rule 4(f)." *Advanced Aerofoil Techs., AG v. Todaro*, No. 11 Civ. 9505 (ALC), 2012 WL 299959, at *1 (S.D.N.Y. Jan. 31, 2012). Rule 4(f)(3) is "neither a last resort nor extraordinary relief. It is merely one means among several which enables service of process on an international defendant." *Id.* (quoting *Rio Props. v. Rio Int'l Interlink*, 284 F.3d 1007, 1015 (9th Cir. 2002)). "The decision of whether to order service of process under Rule 4(f)(3) is 'committed to the sound discretion of the district court.'" *United States v. Lebanese Canadian Bank*, 285 F.R.D. 262, 266 (S.D.N.Y. 2012) (quoting *Madu, Edozie & Madu, P.C. v. SocketWorks Ltd. Nigeria*, 265 F.R.D. 106, 115 (S.D.N.Y. 2010)); *see also In re S. African Apartheid Litig.*, 643 F. Supp. 2d 423, 433 (S.D.N.Y. 2009) ("A court is afforded wide discretion in ordering service of process under Rule 4(f)(3)." (citation omitted)); *Antisevic*, 2009 WL 361739, at *3 ("[Rule 4(f)(3)] provides the Court with flexibility and discretion empowering courts to fit the manner of service utilized to the facts and circumstances of the particular case." (citation omitted)).

Thus, under Rule 4(f)(3), "[a] plaintiff is *not* required to attempt service through the other provisions of Rule 4(f) before the Court may order service pursuant to Rule 4(f)(3)." *Id.* (citation omitted) (emphasis in original). To be sure, "[i]n evaluating whether alternative service is 'necessitate[d]', *Rio Int'l Interlink*, 284 F.3d at 1016, courts in this Circuit have generally required: '(1) a showing that the plaintiff has reasonably attempted to effectuate service on the defendant, and (2) a showing that the circumstances are such that the court's intervention is necessary.'" *Lebanese Canadian Bank*, 285 F.R.D. at 267 (quoting *Devi v. Rajapaska*, No. 11 Civ. 6634 (NRB), 2012 WL 309605, at *1 (S.D.N.Y. Jan. 31, 2012)). But, "[i]nasmuch as Rule

4(f)(3) calls upon a court to exercise its discretion . . . each case must be judged on its facts." *In re GLG Life Tech Corp. Sec. Litig.*, 287 F.R.D. 262, 266 (S.D.N.Y. 2012).

### B. Discussion

Stream SICAV previously asked SmartHeat to accept service on behalf of Wang; SmartHeat refused.  Pl. Serv. Br. 2.  Stream SICAV now seeks to serve Wang by serving SmartHeat's registered agent and counsel, on the premise that these entities will transmit the service papers to Wang.  *Id.* at 3.

#### 1. The Proposed Means of Service Are Not Prohibited By International Agreement

SmartHeat, which challenges the proposed service on Wang's behalf, does not contend that plaintiffs' proposed method of service is prohibited by international agreement.  Nor could it.  Substitute service on a U.S. entity does not trigger the requirements of the Hague Convention. *Volkswagenwerk Aktiengesellschaft v. Schlunk*, 486 U.S. 694, 696, 707 (1988) (upholding service "on a foreign corporation by serving its domestic subsidiary which, under state law, is the foreign corporation's involuntary agent for service of process," and explaining that "[w]here service on a domestic agent is valid and complete under both state law and the Due Process Clause, our inquiry ends and the Convention has no further implications.  Whatever internal, private communications take place between the agent and a foreign principal are beyond the concerns of this case."); *GLG*, 287 F.R.D. at 267–68 (authorizing service on CEO living in China via service to his company's registered domestic agent and counsel; court explains that "[u]se of these methods would not run afoul of the Hague Convention since in both instances no documents would be transmitted abroad").

### 2.  The Proposed Means of Service Comport With Due Process

"Constitutional notions of due process require that any means of service be 'reasonably calculated, under all circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'"  *Antisevic*, 2009 WL 361739, at *4 (quoting *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950)).

Courts have sensibly held that service on a high-level employee's corporate employer, or counsel for that employer, is "reasonably calculated" to apprise the employee of the pendency of the action and therefore comports with due process.  *See, e.g.*, *GLG*, 287 F.R.D. at 267 ("[I]t is impossible to imagine that a corporation's attorney would not advise the corporation's Chairman and Chief Executive Officer of the fact that service destined for that officer had been made upon its attorney. . . . The same is true for service on [the corporation] itself: obviously a corporation will inform its own Chairman and Chief Executive Officer of a lawsuit pending against him.");  *Brown v. China Integrated Energy, Inc.*, 285 F.R.D. 560, 566 (C.D. Cal. 2012) (unserved officers' and directors' "close connection" with the corporation make it "all but certain" that directors served through counsel "will receive notice of the suit").

SmartHeat does not dispute these settled principles.  Def. Serv. Br. 5–6.  Instead, it seeks to distinguish these cases on the grounds that Wang works only for SmartHeat's subsidiaries, not for SmartHeat itself.

Although high-employees of subsidiaries may in some circumstances be far enough removed from their corporate parents that service upon the parents would not be "reasonably calculated" to apprise the employees of the pendency of the action, that is not so here.  Wang is the general manager of all of SmartHeat's Chinese subsidiaries, which in 2011 accounted for 87% of SmartHeat's revenues.  Pl. Serv. Reply Br. 4–5 (citing SmartHeat 10-K (2012)).

21

SmartHeat's 10-K touts Wang as "a key factor in our subsidiaries [sic] success"; it notes that "[t]he continued development of our subsidiaries' business depends upon his continued employment." *Id*. at 5 (citing SmartHeat 10-K (2012)).  SmartHeat's statements make clear that Wang is key to the success of SmartHeat.  And SmartHeat, without its subsidiaries, appears to have little independent content or purpose:  In the company's own words, SmartHeat is a "holding company with no material assets other than the ownership interests of our foreign subsidiaries." *Id*.  Under these circumstances, it is all but inconceivable that SmartHeat and its counsel would be unable to inform Wang of this lawsuit, in the unlikely event they have not already done so.  Service on Wang through service on SmartHeat and its counsel is, therefore, "reasonably calculated" to apprise Wang of the pendency of this action.  It will therefore comport with due process.

### 3.   Service By the Proposed Means Is Warranted Here

Because service through the proposed means would not violate an international agreement and would comport with due process, Rule 4(f)(3) allows it.  The final question, then, is whether the Court should exercise its discretion to order it.  Courts in this Circuit generally require a plaintiff first to reasonably attempt service and then to show that the court's intervention is necessary to achieve it, *Lebanese Canadian Bank*, 285 F.R.D. at 267, but the issue is left to the individual court's broad discretion, and "each case must be judged on its facts." *GLG*, 287 F.R.D. at 266.

Here, Stream SICAV has articulated good reasons why it could not have realistically served Wang until now.  To serve a defendant in China, a plaintiff must provide the defendant's address and the translated complaint to the Chinese Ministry of Justice. *Id*. 1.  Service by the Ministry of Justice may or may not be successful; when successful, it has been said to take

anywhere from four to six months, *id.*, six to eight months, *GLG*, 287 F.R.D. at 266, or six to 18 months, Pl. Serv. Reply Br. n.3.  In this litigation, there has not been even a four-month window since Stream SICAV was appointed lead plaintiff in which the complaint was not amended.  *Id.* at 3.  As a result, any attempted service on Wang, at least until the point at which Stream SICAV filed this motion, would have been rendered useless by the need to re-serve amended pleadings.  Stream SICAV's failure thus far to serve Wang is, therefore, not dispositive.

The question, then, is whether, going forward, Stream SICAV should be required to use the Hague Convention process or be allowed to use the more speedy means it proposes.  Stream SICAV represents, plausibly, that requiring it to serve Wang through the Hague Convention now would either needlessly delay the resolution of this case for many months, when in other respects it is ready to go forward, or result in the case against SmartHeat moving forward decoupled from the case against Wang—an inefficient result.  "Courts have frequently cited delays in service under the Hague Convention as supporting an order of alternative service under Rule 4(f)(3)." *GLG*, 287 F.R.D. at 266 (citing cases).  The Court sees no reason to slow the progress of this case by ordering service through the Convention when service through SmartHeat and its counsel will be just as reliable, if not more so.

## CONCLUSION

For the reasons stated above:

1. SmartHeat's motion to dismiss for failure to state a claim is denied.

2. Stream SICAV's motion to strike is denied.  Stream SICAV sought to strike the stockholder list in order to assure that the list was not considered for the truth of the matters asserted therein.  The Court has not done so.  Accordingly, there is no need to strike the list.

3. Stream SICAV's motion for alternative service of Wang under Rule 4(f)(3) is granted. Plaintiffs are ordered to effect service on Wang by sending, via certified mail, a copy of the SAC and summons to (1) SmartHeat, Inc.'s registered agent and (2) SmartHeat, Inc.'s counsel of record in this litigation. Service shall be deemed effective 5 days after plaintiffs have mailed the documents.

The Court will hold a conference to discuss the management of this case on October 16, 2013, at 9:00 a.m., in courtroom 1305 at the Thurgood Marshall U.S. Courthouse, 40 Centre Street, New York, New York 10007. In advance of that conference, the Court directs the parties to meet and confer and to prepare a Civil Case Management Plan and Scheduling Order in accordance with the Court's Individual Rules. The Court expects the schedule to provide for completion of fact discovery within four months. Counsel are directed to submit the Civil Case Management Plan and Scheduling Order to the Court by October 14, 2013.


SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: October 7, 2013
        New York, New York