```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 6/12/2014
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
STREAM SICAV, DHARANENDRA RAI, and TIEN
CHUNG, Individually and on Behalf of All Others Similarly
Situated,

                            Plaintiffs,

              -v-

JAMES JUN WANG, SMARTHEAT, INC., and JOHN
DOES 1–4,

                            Defendants.
------------------------------------------------------------------X

12 Civ. 6682 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

In this putative class action, plaintiffs allege that defendants SmartHeat, Inc. ("SmartHeat") and James Jun Wang violated § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and the United States Securities and Exchange Commission's implementing rule, 17 C.F.R. § 240.10b-5. During discovery, plaintiffs moved to compel SmartHeat to produce responsive documents held by its subsidiaries. SmartHeat claimed that such documents were not within its custody, possession, or control. To resolve that dispute, the Court ordered discovery as to SmartHeat's access to documents held by its subsidiaries. The parties have now completed that discovery and briefed the issue. For the reasons that follow, the Court holds that SmartHeat does not have access to documents held by its subsidiaries. Plaintiffs' motion to compel is therefore denied.

I.   **Background**

   **A. Facts Alleged in the Second Amended Complaint**

SmartHeat is a Nevada holding company whose subsidiaries operate primarily in China. Dkt. 52 ("Second Amended Complaint" or "SAC") ¶ 31.  SmartHeat "designs, manufactures, and sells clean technology plate heat exchangers and related systems in China."  *Id.*  Its technology is used in commercial and residential buildings.  *Id.*  Wang founded SmartHeat and, until May 25, 2012, served as its CEO and board chairman.  *Id.* ¶ 29.  He remains chairman and CEO of SmartHeat's principal subsidiary, SmartHeat Taiyu (Shenyang) Energy Technology Co., Ltd. ("Taiyu"), which he founded in 2002.  *Id.* ¶¶ 29–30.

On January 29, 2009, SmartHeat's stock started trading on the NASDAQ stock exchange. *Id.* ¶ 3.  That same day, SmartHeat announced that its senior management had entered into a lock-up agreement that prevented them from selling any shares until 2012.  *Id.*  The locked-up shares represented approximately 61% of SmartHeat's outstanding common stock.  *Id.* ¶ 53. That day, SmartHeat issued a press release that quoted Wang as saying, "Our entire senior management team has voluntarily entered into share lock-ups as a reflection of our great confidence in the prospect of SmartHeat."  *Id.* ¶ 49.  Throughout 2009, SmartHeat and others continued to tout the lock-up agreement.  *Id.* ¶¶ 51–54.  On January 11, 2010, SmartHeat's stock price reached its all-time peak, at $186 per share.  *Id.* ¶ 95.

The SAC alleges two instances in which SmartHeat subsequently failed to disclose new information that allegedly rendered materially false or misleading its original statements about the lock-up agreement.  First, the SAC alleges, on February 5, 2010, Wang and senior management entered into a revised lock-up agreement, which stated that the lock-up agreement had been terminated on January 1, 2010, a month earlier, but did not disclose this revision to

shareholders. *Id.* ¶¶ 6, 13. Second, the SAC alleges, between February 2010 and August 13, 2010, Wang, working through SmartHeat's counsel, Robert Newman, caused 380,000 locked-up SmartHeat shares, owned by "SmartHeat insiders," to be sold for $23 million, again without any disclosure that shares subject to the previously touted lock-up agreement were being sold. *Id.* ¶¶ 7, 57–65. The 380,000 shares had been subject to the earlier lock-up agreement, but were freed from that restriction by the undisclosed February 5, 2010 agreement. *Id.* ¶ 7.

The SAC alleges that the sales of the 380,000 locked-up shares "put steady downward pressure on SmartHeat's stock price," causing it to drop almost 44 percent between February 24, 2010, and May 3, 2010. *Id.* ¶ 102. Then, in late 2011, the Financial Industry Regulatory Authority (FINRA) charged the brokerage company that had executed the sales, First Merger Capital, Inc., and five of its employees, with failure to report the apparently suspicious sales. *Id.* ¶ 14. In early 2012, the employees accepted FINRA's allegations. *Id.* ¶ 15.

On May 25, 2012, following a two-day meeting of SmartHeat's board, Wang resigned as CEO. *Id.* ¶ 16. He maintained his positions at SmartHeat's subsidiaries, including as chairman and CEO of Taiyu, SmartHeat's principal subsidiary. *Id.* ¶ 29. At the same time, SmartHeat obtained a $2 million revolving line of credit with a 1.25% per month interest rate and a 4% origination fee from a company at which Wang was a principal, Northtech. *Id.* ¶ 17. The line of credit was secured by most of SmartHeat's assets. *Id.*

On May 30, 2012, SmartHeat reported the results of its May 25, 2012 board meeting. *Id.* ¶ 18. That same day, NASAQ halted trading in SmartHeat's shares, seeking information regarding "the restructuring of [SmartHeat's] board and management and [SmartHeat's] entry into a secured revolving credit facility." *Id.* NASDAQ then delisted SmartHeat. *Id.* ¶ 19. When trading of SmartHeat's stock resumed, this time on the pink sheets rather than on the NASDAQ,

SmartHeat's share price fell from $4.04 to $1.30 on the first day. *Id.* ¶ 20. Between then and the filing of the SAC, SmartHeat's stock price traded at between $0.25 and $1.35 per share. *Id.* ¶ 115.

### B. Procedural History Prior to the Instant Dispute

On August 31, 2012, the initial Complaint in this case was filed by putative lead plaintiff Steve Leshinsky. Dkt. 1. On December 14, 2012, the Court appointed Stream SICAV, an institutional investment fund incorporated in Luxembourg, to serve as lead plaintiff. Dkt. 18. Plaintiffs later filed an Amended Complaint and a Second Amended Complaint. Dkt. 22, 52. On May 8, 2013, SmartHeat moved to dismiss the Second Amended Complaint. Dkt. 54. On July 24, 2013, plaintiffs moved to serve Wang, who lives in China, through SmartHeat's registered agent and counsel. Dkt. 66. On October 7, 2013, after briefing, the Court denied defendant's motion to dismiss and granted plaintiffs' motion for alternative service of Wang. Dkt. 70. On October 21, 2013, the Court revised and approved the parties' case management plan, under which fact discovery was to close on April 16, 2014. Dkt. 75–76. On November 7, 2013, the Clerk of Court issued a certificate of default as to Wang. Dkt. 83.

### C. Procedural History of the Instant Dispute

On January 3, 2014, plaintiffs informed the Court that, in response to their requests for production, SmartHeat had disclaimed any ability to access documents held by its Chinese subsidiaries, and that, as a result, its entire production consisted of 47 documents, most of them briefs or exhibits thereto opposing the NASDAQ's action to delist its shares. Dkt. 84. Plaintiffs requested an order directing SmartHeat to produce all responsive documents in its possession, including those held by its subsidiaries. *Id.*

On January 21, 2014, the Court held a telephone conference with the parties and directed plaintiffs, under Federal Rule of Procedure 30(b)(6), to "notice a deposition of a person at SmartHeat, Inc. to testify about that company's processes and practices with respect to the creation and custody of, and access to, documents including but not limited to the extent to which SmartHeat, Inc., or its agents, have had access to documents of its subsidiaries." Dkt. 89. The Court directed the parties to brief the issue "[i]f, after the deposition, the parties remain in dispute about the ability of SmartHeat, Inc. to produce the documents that plaintiff has requested." *Id.*

On January 29, 2014, the Court approved plaintiffs' deposition notice after defendants challenged its scope. Dkt. 95. On February 24, 2014, plaintiffs deposed Oliver Bialowons, the President and CEO of SmartHeat. During the deposition, the parties reached an impasse and requested a telephone conference with the Court. During that conference, the Court clarified the scope of the deposition and authorized continuation of the deposition by video, as Bialowons, to the Court's surprise, had arranged to leave for the airport at 3 p.m, in mid-deposition, to return home to Germany. *See* Dkt. 106 Ex. 2 ("Bialowons Dep. I") at 86–101.

On February 28, 2014, plaintiffs submitted a letter requesting, *inter alia*, that the Court grant them seven more hours of deposition time, on the grounds that "the witness's and counsel's misconduct [at the original deposition] made the time Plaintiffs have had essentially valueless." Dkt. 106 at 3. On March 7, 2014, defendants replied. Dkt. 109. On March 11, 2014, after carefully reviewing the deposition transcript and the parties' filings, the Court concluded that, at the original deposition, Bialowons had not been prepared to discuss, in a substantive manner, SmartHeat's access to documents held by its subsidiaries, and that his preparation appeared to have been more suited to stonewalling than substantive discussion. Dkt. 111. The Court

therefore allowed plaintiffs to depose Bialowons for seven more hours and clarified the topics on which Bialowons should be prepared to give answers. *Id.*

On April 3, 2014, Bialowons was deposed again. Dkt. 133 Ex. 1 ("Bialowons Dep. II"). On April 4, 2014, the Court held a conference with the parties concerning a motion by defense counsel to withdraw. *See* Dkt. 117–120. At that conference, the Court learned that SmartHeat had not completed its document production relevant to the instant discovery dispute. The Court therefore directed SmartHeat to complete its document production and permitted plaintiffs to re-open their deposition of Bialowons so as to pose questions to him, within the scope of the deposition notice, regarding the documents to be produced. Dkt. 123. Accordingly, on April 29, 2014, Bialowons was deposed for a third time. Dkt. 133 Ex. 2 ("Bialowons Dep. III").

On May 6, 2014, plaintiffs submitted their letter brief concerning this discovery dispute. Dkt. 133 ("Pl. Br."). On May 9, 2014, SmartHeat replied. Dkt. 134 ("Def. Br.").

**II.     Discussion**

Federal Rule of Civil Procedure 34 allows a party to demand documents which are in the responding party's "possession, custody or control." Fed. R. Civ. P. 34(a). Plaintiffs seek to compel SmartHeat to produce relevant documents within the possession, custody, or control of SmartHeat's subsidiaries.

"A basic tenet of American corporate law is that the corporation and its shareholders are distinct entities." *Dole Food Co. v. Patrickson*, 538 U.S. 468, 474 (2003). A corollary is that a parent corporation is distinct from a separately incorporated subsidiary. *Id.* at 475 ("A corporate parent which owns the shares of a subsidiary does not, for that reason alone, own or have legal title to the assets of the subsidiary. . . . 'The properties of two corporations are distinct, though the same shareholders own or control both. A holding corporation does not own the subsidiary's

property.'") (quoting 1 W. Fletcher, Cyclopedia of the Law of Private Corporations § 31, at 514 (rev. ed. 1999)).  Each corporation is a "distinct legal entity, with legal rights, obligations, powers, and privileges different from those of the natural [or legal] individuals who created it, who own it, or whom it employs." *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 163 (2001).  Because parent and subsidiary are legally distinct, a document held by a subsidiary is not within the control of the parent, and therefore a parent cannot be legally obligated at the threat of sanction to produce it, unless "the intracorporate relationship establishes some legal right, authority or ability [of the parent] to obtain requested documents on demand." *DeSmeth v. Samsung Am., Inc.*, No. 92 Civ. 3710 (LBS) (RLE), 1998 WL 74297, at *9 (S.D.N.Y. Feb. 20, 1998); *see also In re Vivendi Universal, S.A. Sec. Litig.*, No. 02 Civ. 5571 (RJH) (HBP), 2009 WL 8588405, at *3 (S.D.N.Y. July 10, 2009) ("Where documents from a corporation are sought by way of a subpoena served on an affiliate, the Court must inquire into the nature of the relationship between the affiliates to determine whether the entity on which the subpoena was served has the practical ability to obtain the documents from the affiliate.").

In determining a parent's control over a subsidiary in this context, district courts in this Circuit consider "[1] the degree of ownership and control exercised by the parent over the subsidiary, [2] a showing that the two entities operate as one, [3] demonstrated access to documents in the ordinary course of business, and [4] an agency relationship." *DeSmeth*, 1998 WL 74297, at *9; *accord In re Vivendi*, 2009 WL 8588405, at *3; *In re Ski Train Fire of Nov. 11, 2000 Kaprun Austria*, MDL 1428 (SAS) (THK), 2006 WL 1328259, at *5 (S.D.N.Y. May 16, 2006); *Dietrich v. Bauer*, No. 95 Civ. 7051 (RWS), 2000 WL 1171132, at *3 (S.D.N.Y. Aug. 16, 2000), *affirmed in part and clarified in part on reconsideration*, 198 F.R.D. 397 (S.D.N.Y. 2001); *cf. Gerling Int'l Ins. Co. v. C.I.R.*, 839 F.2d 131, 140 (3d Cir. 1988) ("Where the litigating

corporation is the parent of the corporation possessing the records, courts have found the requisite control where 'a subsidiary corporation acts as a direct instrumentality of and in direct cooperation with its parent corporation, and where the properties and affairs of the two [were] . . . inextricably confused as to a particular transaction.'") (quoting *Acme Precision Products, Inc. v. American Alloys Corp.*, 422 F.2d 1395, 1398 (8th Cir. 1970)). This inquiry is "often highly fact-specific," 8A Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, Federal Practice and Procedure § 2210 (3d ed), and the burden of proof falls on the party seeking discovery, *see In re Vivendi*, 2009 WL 8588405, at *3; *S.E.C. v. Credit Bancorp, Ltd.*, 194 F.R.D. 469, 472 (S.D.N.Y. 2000); *Golden Trade S.r.L. v. Lee Apparel Co.*, 143 F.R.D. 514, 525 n.7 (S.D.N.Y. 1992).

      **A.**     **SmartHeat's Degree of Ownership and Control over its Subsidiaries**

The first factor in determining whether SmartHeat has control over documents in the custody of its subsidiaries is the degree of ownership and control that SmartHeat exercises over its subsidiaries.

SmartHeat acknowledges that it indirectly owns whole or controlling shares in nine subsidiaries.[1] *See* Def. Br. Ex. A (showing that SmartHeat wholly owns two Nevada corporations, and that these corporations (1) wholly own three Chinese subsidiaries and one German subsidiary, (2) own controlling shares in five Chinese subsidiaries, and (3) own a 30.6% share in one Chinese company). Mere ownership by a parent, however, is not a decisive factor, but merely one factor among several. *See In re Vivendi*, 2009 WL 8588405, at *3 ("[A]lthough there is no dispute that SGBT is a wholly owned subsidiary of SG, that fact is not controlling in this Circuit."); *In re Ski Train*, 64 Fed. R. Serv. 3d 594, at *6 (a parent's "complete ownership"

---

[1] Plaintiffs do not specify from which subsidiaries they seek to compel production.

of its subsidiary "suggests that the first factor in the parent-subsidiary control test tips in Plaintiffs' favor"); *Motorola Credit Corp. v. Uzan*, No. 02 Civ. 666 JSR, 2013 WL 6098388, at *3 (S.D.N.Y. Nov. 20, 2013) ("This pragmatic approach to understanding 'control' will *often* result in a finding that a parent corporation has, *practically* speaking, sufficient control over its subsidiaries to require that it search them in compliance with a subpoena served on the parent.") (emphases added). Plaintiffs do not cite any cases from this District holding that ownership of whole or controlling shares establishes, by itself, a parent's control over its subsidiary for the purpose of Rule 34; rather, the cases plaintiffs cite, and indeed all cases from this District of which this Court is aware, engage in a factual inquiry into practical control, of which ownership is but one part. *Gerling*, which plaintiffs cite for the proposition that "[a] parent always controls a subsidiary," Pl. Br. 5, does not so hold. Instead, *Gerling* notes that two district court cases from the late 1970s adopted this *per se* approach, although *Gerling* itself appears to adopt the more common, multi-factor approach. 839 F.2d at 140–41.

Significantly, as to the degree of ownership and control factor, SmartHeat appears in practice to exert little, if any, control over its subsidiaries. Bialowons testified that SmartHeat cannot participate in its subsidiaries' decision-making. Bialowons Dep. III at 29. SmartHeat cannot, according to its CEO, prevent its subsidiaries from, for example, buying or selling a factory. *Id.* And SmartHeat appears to do little, if anything, to monitor its subsidiaries' activities or to independently verify the financial information they provide as inputs to SmartHeat's consolidated financial statements. *See* Bialowons Dep. II at 23–29, 56–60, 65–67. SmartHeat does not prepare its own financial statements. Nor, apparently, does it receive any of its subsidiaries' individual financial statements—instead, it receives its consolidated financial statements in near-final form from its outside counsel, after its American accounting firm has

prepared the financial statements based on translated versions of documents provided by the subsidiaries' Chinese accounting firm. *Id.* at 23–29, 37; Pl. Br. Ex. 8. Bialowons testified that he has no need to see financial documents from SmartHeat's subsidiaries; he needs only the ultimate financial information. Bialowons Dep. II at 21.

Plaintiffs point to only one episode in which SmartHeat exerted control over its subsidiaries: In 2010, "SmartHeat caused its subsidiaries to create an internal audit department, and retained a third-party internal audit firm, ShineWing, to assess its subsidiaries' internal control over financial reporting." Pl. Br. 2 (citing SmartHeat Letter to SEC, Feb. 3, 2012).[2] But this limited instance of control, which occurred four years ago, little changes the overall picture of SmartHeat's limited authority over its subsidiaries.

In sum, while SmartHeat's ownership of its subsidiaries is a factor favoring plaintiffs in their bid for the foreign subsidiaries' documents, the lack of any track record in which SmartHeat has actually exerted control points in the opposite direction. It undermines plaintiffs' claims that SmartHeat has the legal authority or practical ability to obtain documents at will from its subsidiaries.

### B.  Whether SmartHeat and its Subsidiaries Operate as One

The second factor is whether SmartHeat and its subsidiaries operate as one entity, *i.e.*, whether their day-to-day operations are substantially in common with each other. *See In re Vivendi*, 2009 WL 8588405, at *4. A parent and subsidiary may be said to operate as one entity if, for example, "they shared employees, shared facilities, shared office space and utilized common practices and forms." *Id.*

---

[2] Available at http://www.sec.gov/Archives/edgar/data/1384135/000118518512000170/filename1.htm.

As to this point, the facts point in both directions, but mostly favor SmartHeat. To begin with, SmartHeat has very little in the way of activities; by definition there is little it can do, or does, in concert with its subsidiaries. SmartHeat is a holding company. SmartHeat 2013 10-K, at 1.[3] It has no material assets other than the ownership interests of its subsidiaries, which manufacture, sell, and service plate heat exchangers. *Id.* at 1, 13, 30. SmartHeat's activities appear to consist entirely of holding board meetings, keeping board minutes, making filings with the SEC, and ensuring that these filings are truthful. Bialowons Dep. II at 56–60, 123–24, 133.

SmartHeat attests that it has no employees, *see* Bialowons Dep. II at 66–67, a position that plaintiffs do not dispute, *see* Pl. Br. 3, and thus it cannot share employees with its subsidiaries. That said, certain critical SmartHeat personnel either are, or were, also associated with the subsidiaries. SmartHeat's acting chief accountant and principal financial officer, Yingkai Wang, is also the financial manager of SmartHeat's subsidiaries. *Id.* at 70–71; Pl. Br. Ex. 10; SmartHeat 2013 10-K, at 42. SmartHeat's Corporate Secretary, Jane (Huajun) Ai, also works for SmartHeat's subsidiaries; she is not paid by SmartHeat. Bialowons Dep. II at 170. Additionally, James Jun Wang, SmartHeat's founder and former Chairman, President and CEO, is no longer associated with SmartHeat, but is now the general manager of SmartHeat's Chinese subsidiaries. SmartHeat 2013 10-K, at 17. However, Bialowons, SmartHeat's current President and CEO, has no affiliation with its subsidiaries.

SmartHeat also has no office, Bialowons Dep. II at 99, and therefore cannot share one with its subsidiaries. Bialowons performs his SmartHeat work from wherever he is located at the moment; he never works from SmartHeat's subsidiaries' offices. *Id.* SmartHeat does share a

---

[3] Available at http://www.sec.gov/Archives/edgar/data/1384135/000118518514000958/smartheat10k123113.htm.

miniscule facility with its principal subsidiary: It has a drawer or binder in that subsidiary's office, in which SmartHeat keeps its corporate minutes.  Pl. Br. 3 n.9 (citing Bialowons Dep. II at 107)[4] (drawer); Bialowons Dep. III at 81 (binder).

In sum, there is little commonality between SmartHeat's day-to-day operations and the day-to-day operations of its subsidiaries.  SmartHeat engages in a few, formalistic corporate activities—board meetings and regulatory filings—while its subsidiaries manufacture, sell, and service plate heat exchangers.  *See* SmartHeat 2013 10-K at 1.  SmartHeat is certainly dependent on its subsidiaries, as evidenced by the joint roles of Yingkai Wang and Jane (Huajun) Ai and by the fact that SmartHeat's sole physical manifestation—the drawer or binder in which it keeps its corporate minutes—is in its principal subsidiary's office.  But that dependence does not make SmartHeat the alter ego of its subsidiaries; on the contrary, SmartHeat and its subsidiaries appear to respect the corporate form.  If anything, SmartHeat appears to be unusually distinct from its subsidiaries, as illustrated by its apparent inability to affect its subsidiaries' decision-making and its lack of independent oversight over its subsidiaries' finances.

In arguing that SmartHeat and its subsidiaries operate as one, and that SmartHeat is its subsidiaries' alter ego, plaintiffs assert that nearly all of SmartHeat's activities are in essence performed by its subsidiaries, in that SmartHeat does little more than file documents with the SEC, and those are drafted by the employees of SmartHeat's subsidiaries, whom SmartHeat does not pay.  Pl. Br. 6.  But that is not entirely so.  To be sure, Yingkai Wang, SmartHeat's acting chief accountant, is apparently employed only by its subsidiaries; and he does sign SmartHeat's regulatory filings, and perhaps has some role in their preparation, although plaintiffs' letter brief

---

[4] Neither party provided this portion of the Bialowons deposition to the Court.  However, SmartHeat has not contested plaintiffs' representation that Bialowons testified that SmartHeat keeps its corporate minutes in a drawer in the office of its principal subsidiary; accordingly, the Court assumes that this is an accurate representation of Bialowons's testimony.

does not explain that role with any clarity. However, SmartHeat's audits, and the preparation of its financial statements, are conducted by an outside accounting firm, which SmartHeat pays and which, as plaintiffs concede, is SmartHeat's agent. Bialowons Dep. II at 28, 97; Pl. Br. 4, 6. SmartHeat's activities are not, therefore, performed entirely by its subsidiaries; some are performed by subsidiaries, but others, perhaps the bulk, are performed by its outside agents. Moreover, in asserting conclusorily that "SmartHeat and its subsidiaries 'operate as one' and SmartHeat is its subsidiaries' alter ego," Pl. Br. 6, plaintiffs conflate all of these subsidiaries. Plaintiffs do not commit as to whether they view SmartHeat as the alter ego of one particular subsidiary, or, somehow, of each of its nine subsidiaries; and, if the latter, whether the nine subsidiaries are therefore alter egos of each other.

Finally, as to this factor, even if the Court were persuaded that SmartHeat is the alter ego of one or more of its subsidiaries, that finding would not yield the conclusion that the documents of SmartHeat's subsidiaries are within *SmartHeat's* control. In the standard case in which a discovery dispute turns on the relationship between a parent and a subsidiary, the parent's control over the subsidiary's documents is established in part by showing that the *subsidiary* is the alter ago of the parent. But this case does not present that scenario. Here, even accepting plaintiffs' claim as true, the parent is the alter ego of the subsidiary, not vice versa.

Plaintiffs have therefore not shown that SmartHeat and its subsidiaries operate as one entity or are each others' alter egos. This lack of unity weighs against a finding that SmartHeat has the legal authority or practical ability to demand documents from its subsidiaries.

    **C.    SmartHeat's Access to its Subsidiaries' Documents in the Ordinary Course of Business**

The third relevant factor is whether SmartHeat has access, in the ordinary course of business, to its subsidiaries' documents. *See In re Vivendi*, 2009 WL 8588405, at *3 ("Where

13

the corporations in issue have a parent-subsidiary relationship, 'access and ability to obtain documents have been found where documents ordinarily flow freely between parent and subsidiary.'") (quoting *Linde v. Arab Bank, plc*, 262 F.R.D. 136, 2009 WL 1456573, at *2 (E.D.N.Y. May 22, 2009)).

Even according to plaintiffs, however, SmartHeat's present access to its subsidiaries' documents in the ordinary course of business is close to nil:

> SmartHeat employs [ ] a cumbersome process to obtain any information or documents from its subsidiaries; the information or documents have to be provided to SmartHeat's Chinese auditors, Evertrust CPA, who provided it to Diligency, Inc., who provided it to SmartHeat's US auditors, Goldman Kurland Mohidin, LLP, who provided it to SmartHeat's counsel Robert Newman, who provided it to SmartHeat. Any request for information would have to go backwards through the same process (the "Process").
>
> . . .
>
> Mr. Bialowons is not aware of any situations in which the process was followed in reverse. Mr. Bialowons testified that SmartHeat's consolidated financial statements are prepared through the Process. . . . If SmartHeat needs any more information, it must request it through the Process. It has not received any other information than SmartHeat's financial information.

Pl. Br. 3–4 (citing Bialowons Dep. II at 22–32, 151–52; Pl. Br. Ex. 8).

Seeking to minimize the significance of SmartHeat's present paltry access to its subsidiaries' documents, plaintiffs argue that this is a recent development. They argue that, until defendant Wang resigned as SmartHeat CEO on May 25, 2012, SmartHeat had regular access to its subsidiaries' documents, and that Wang's resignation should not be taken to have genuinely inhibited SmartHeat's access to such documents. Pl. Br. 6. But plaintiffs have not established that SmartHeat ever had regular access to its subsidiaries' documents. Plaintiffs identify only two instances in which SmartHeat ostensibly sought documents from its subsidiaries, but on close review, it is clear that in neither case did SmartHeat actually do so. First, on August 11,

2011, SmartHeat's outside counsel requested copies of any emails that the four insiders who had allegedly sold locked-up shares had sent to SmartHeat or Wang regarding the sales of the locked-up shares. *Id.* at 2 (citing Pl. Br. Ex. 5). But that request was directed at documents held by SmartHeat and its then-CEO Wang; it was not directed at documents held by SmartHeat's subsidiaries. Second, on January 13, 2012, Arnold Staloff, one of SmartHeat's U.S. directors, asked Wang and Rhett Wang for their "analysis of the valuation" of "the two companies that were recently acquired" by SmartHeat, to be used in determining the ratio of a reverse stock split. *Id.* (citing Pl. Br. Ex. 3). Again, that request also was not directed at the subsidiaries or at documents held by them; it sought assessments from two SmartHeat-affiliated persons: James Jun Wang, an officer of SmartHeat, and Rhett Wang, also apparently an officer of SmartHeat. *See* Pl. Br. Ex. 3 (addressed in part to "rhettwang@smartheatinc.com"); *id.* Ex. 6 (email dated June 21, 2011 in which Rhett Wang's signature block reads "VP Strategic Development . . . Email: RhettWang@smartheatinc.com"). Plaintiffs themselves characterize this email as one in which "SmartHeat's US director casually sought financial information directly from *its* CEO." Pl. Br. 2 (emphasis added).

Plaintiffs also argue that "SmartHeat's agents, its auditors, continue to have access to information from SmartHeat's subsidiaries." *Id.* at 6. But plaintiffs do not cite evidence of this. They fail to establish that SmartHeat's auditors—as opposed to SmartHeat's *subsidiaries'* auditors—have access to financial statements of the subsidiaries. Bialowons testified that he did not know—and the record does not otherwise make clear—at what point in that process the subsidiaries' financial statements are rolled up into the consolidated form in which SmartHeat receives them. Bialowons Dep. II at 25–27.

The evidence before the Court reveals that SmartHeat has at best very limited and tenuous access to any documents of its subsidiaries, and plaintiffs have not adduced any evidence that this is a recent phenomenon. SmartHeat's lack of access counsels against a finding that documents held by SmartHeat's subsidiaries are within SmartHeat's control.

### D. Agency Relationship

Plaintiffs only half-heartedly argue that SmartHeat and its subsidiaries have an agency relationship. They point to one instance in which SmartHeat proposed to sign a joint development agreement with the Stanton Group, a Massachusetts company, even though the work would be conducted by SmartHeat's subsidiaries. Pl. Br. 2 (citing Pl. Br. Ex. 6 and Bialowons Dep. III at 79). At most, this shows that SmartHeat was confident that, had it entered into the joint development agreement, it could secure the agreement of its subsidiaries to perform the work set out in that agreement. However, nothing in the Stanton Group email chain indicates that SmartHeat ever represented that it was acting as the agent of one of its subsidiaries, such that it could bind a subsidiary contractually.

After carefully reviewing the record evidence, the Court concludes that plaintiffs have not met their burden of showing that SmartHeat has the "legal right, authority or ability" to obtain documents from its subsidiaries on demand. *DeSmeth*, 1998 WL 74297, at *9. SmartHeat owns majority shares in its subsidiaries, but in practice it does not actually control them, engage in substantial common operations with them, regularly obtain documents from them, or contractually bind them. SmartHeat therefore does not control documents merely because its subsidiaries have those documents in their custody, possession, or control.[5]

---

[5] SmartHeat also states, based on a questionnaire propounded to 19 employees of the subsidiaries, that its subsidiaries do not have any responsive documents in their custody, possession, or control. Def. Br. 5 (citing Def. Br. Ex. C). Absent a sworn affidavit stating that

## CONCLUSION

For the foregoing reasons, plaintiffs' motion to compel SmartHeat to produce responsive documents held by its subsidiaries is denied.

When this dispute arose on January 3, 2014, roughly three and a half months remained until the close of fact discovery on April 16, 2014. *See* Dkt. 76. Accordingly, the parties are directed, by June 20, 2014, to submit a proposed revised case management plan, setting forth a schedule under which merits discovery will conclude no later than September 26, 2014, about three and a half months from the date of this order.

SO ORDERED.

*Paul A. Engelmayer*
Paul A. Engelmayer
United States District Judge

Dated: June 12, 2014
       New York, New York

---

an identified person has performed a defined search for responsive documents, the Court is skeptical of this representation. However, because the Court holds that documents held by SmartHeat's subsidiaries are not within SmartHeat's control, the Court need not rely on SmartHeat's representation as to the existence of such documents.